Filed 2/26/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| BEL AIR INTERNET, LLC, | B270268 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC586145) |
| v. | |
| ALBERT MORALES et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Mel Red Recana, Judge.  Reversed with directions.

Kesluk, Silverstein & Jacob, Douglas N. Silverstein, Mia Munro and Geoffrey L. Bryan for Defendants and Appellants.

Skiermont Derby, Paul B. Derby, John J. O'Kane IV and Mane Sardaryan for Plaintiff and Respondent.

_____

This appeal requires us to consider the role of the pleadings and supporting declarations in deciding a motion to strike under the anti-SLAPP statute (Code Civ. Proc., § 425.16).[1] Section 425.16 protects the exercise of certain constitutional rights by permitting a motion to strike when a complaint targets specified conduct that involves the right to freedom of speech or the right to petition the government. When a plaintiff's complaint shows that a claim arises from communications that are protected under the statute, must the defendant support a motion to strike with declarations confirming that his or her actions fall within one of the categories of protected conduct?

We conclude that, when the complaint itself alleges protected activity, a moving party may rely on the plaintiff's allegations alone in arguing that the plaintiff's claims arise from an act "in furtherance of the person's right of petition or free speech." (§ 425.16, subd. (b)(1).) While section 425.16 requires a court to *consider* both the "pleadings" and the "supporting and opposing affidavits stating the facts upon which the liability or defense is based" (§ 425.16, subd. (b)(2)), it does not require a moving party to *submit* declarations confirming the factual basis for the plaintiff's claims. Otherwise, a defendant who disputes the plaintiff's allegations (as appellants do here) might be precluded from bringing an anti-SLAPP motion. That would have the perverse effect of making anti-SLAPP relief unavailable when a plaintiff alleges a baseless claim, which is precisely the kind of claim that section 425.16 was intended to address. (See

_____

[1] Subsequent undesignated statutory references are to the Code of Civil Procedure. "SLAPP" is an acronym for "[s]trategic lawsuit against public participation." (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1109, fn. 1 (*Briggs*).)

*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*) [the anti-SLAPP statute "provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity"].)

Here, plaintiff and respondent Bel Air Internet, LLC (Bel Air) alleges that defendants and appellants Albert Morales and Flavio Delabra (collectively, Appellants) encouraged fellow employees of Bel Air to quit and sue the company for alleged employment violations rather than sign a release of such claims that Bel Air requested. Consistent with several decisions by our Supreme Court, we conclude that such prelitigation conduct encouraging third parties to sue is protected petitioning activity under section 425.16, subdivision (e). In bringing a motion to strike under that section, Appellants could rely on Bel Air's allegations that they urged other employees to quit and sue, even though Appellants denied engaging in this conduct. We therefore reverse the trial court's order denying Appellants' motion to strike.

## BACKGROUND

Bel Air is a DirecTV service provider. Until June 8, 2015, Appellants worked at Bel Air as field installers. Appellants left the company under circumstances that Bel Air describes as a voluntary departure and Appellants characterize as wrongful termination. As shown below, the parties disagree on most other critical facts as well.

### 1. *Bel Air's Complaint*

Bel Air filed its complaint on June 25, 2015. The complaint alleges causes of action for: (1) intentional interference with contractual relations; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; and (4) conversion (against Morales only). The first three causes of

3

action (the Contract Claims) are based upon two different theories of interference and breach.

First, Bel Air claims that Appellants interfered with its contractual relationship with other Bel Air employees by encouraging them to leave their jobs and sue Bel Air. Bel Air's intentional interference claim alleges that Appellants "advised, counseled, encouraged and sought to persuade various BEL AIR employees to end their employment by BEL AIR, and on information and belief, to refuse to sign certain employment-related documents, create the false appearance of being terminated by BEL AIR, and pursue employment-related lawsuits against BEL AIR, possibly at the encouragement or direction of their own lawyers." Bel Air's second and third causes of action allege more succinctly that Appellants acted "in contravention of their duties of care and loyalty" by "seeking to encourage other BEL AIR employees to quit and sue BEL AIR, and thereby disrupt BEL AIR's business operations."

Second, Bel Air's second and third causes of action allege that Appellants breached their contractual duties to Bel Air by "not performing employment services for BEL AIR from June 8, 2015, the date on which they left work without explanation and did not return, through the last date on which [Appellants] were paid by BEL AIR."

## 2.  *The Motion to Strike*

### a.  *Appellants' motion*

On August 24, 2015, Appellants filed a motion to strike under section 425.16, seeking dismissal of Bel Air's first three causes of action. Appellants supported their motion with their own declarations and a declaration from another Bel Air field installer, Andrew Figueroa.

4

According to Appellants, until about June 1, 2015, Bel Air paid them and other Bel Air installers as "exempt" employees under the applicable employment statutes and regulations. Appellants were not paid for hours worked above eight hours per day or 40 hours per week, and were not informed of their right to meal and rest breaks or compensated for missed breaks.

On June 1, 2015, a Bel Air manager, Kaj Louis-Johnson, held a meeting with Bel Air employees during which he provided them with several documents. One document outlined new hourly payment procedures and compensation. That document explained that, going forward, Bel Air employees would be "paid overtime in accordance with state and federal overtime requirements," including for hours worked over eight hours a day or 40 hours a week. It also explained that employees would be entitled to rest breaks and meal periods.

Another document, entitled, "General Release," stated that it was to "settle all potential claims by Employee against Employer [Bel Air] that may have accrued up to the date this Agreement was signed." The General Release expressly released claims relating to Bel Air's "classification of Employee as exempt rather than non-exempt (hereinafter referred to as 'Prior Classification') that could have been alleged for violations of any state or federal laws (including but not limited to the California Labor Code and the Fair Labor Standards Act (29 U.S.C. § 201, et seq.), Wage Order No. 4, California's Unfair Business Practices law, and California's Private Attorney General Act." The General Release stated that it was supported by consideration that included "[e]mployee's continued employment as an at-will

employee" and additional compensation that the employee would "on occasion receive . . . for certain hours not actually worked."[2]

Appellants refused to sign the General Release. Several meetings followed on June 8, 2015. Appellants claim that, at the first meeting, Louis-Johnson told Appellants and other employees that Bel Air would terminate their employment if they did not sign the General Release that day. At subsequent meetings on the morning of June 8 attended by Bel Air's owner, Terry Koosed, its General Counsel, Joshua White, and Louis-Johnson, Appellants continued to refuse to sign the General Release. Koosed told Morales that he would "need to find . . . another job" and wished Delabra "good luck in the future." White gave Morales a document that he called a " 'severance' agreement." That document was entitled, "Settlement Agreement and General Release," and included reference to a proposed settlement payment of $1,500, which the agreement characterized as a "disputed amount." Appellants left the meetings believing they had been fired.

In their declarations, Appellants denied encouraging other employees " 'to end their employment' " and " 'create the false appearance of being terminated by Bel Air.' " They also denied Bel Air's allegation that they encouraged litigation, stating in their declarations that they "did not 'seek to encourage other BEL AIR employees to quit and sue BEL AIR.' "

### b. *Bel Air's opposition*

Bel Air filed an opposition supported by declarations from Louis-Johnson, Koosed, White, and other Bel Air employees.

---

[2] Appellants submitted the document explaining the new compensation procedures and the General Release as exhibits to their motion to strike.

6

Bel Air denied that it had terminated Appellants' employment.  It also claimed that no Bel Air employee "has ever been told that he had to sign any employment-related documents, or else he would lose his job."  According to Bel Air, Appellants voluntarily left their jobs.  Morales said that he had another job starting in a couple of months that paid substantially more, and Delabra said that Bel Air had "become too corporate."  Bel Air claimed that Appellants picked up work equipment on June 8, 2015, giving the impression that they intended to continue working, but never returned to work although they were paid "through mid-June."

According to another Bel Air field installer, after the meetings on June 8, Morales said that he was "leaving Bel Air, and that he would soon be sitting on a beach in the Bahamas." Koosed said in his declaration that, after the meetings on June 8, 2015, Bel Air attempted to get Appellants to return to work and that Bel Air continued to pay them through June 15, 2015 (for Delabra), and June 19, 2015 (for Morales), "despite doing no work of any kind for Bel Air after the morning meeting on June 8."

3.    *The Trial Court's Ruling*

Prior to the hearing on Appellants' motion to strike on November 23, 2015, the trial court issued a tentative ruling granting the motion.  With respect to the first step of the anti-SLAPP analysis (which, as discussed below, focuses on whether a plaintiff's claims arise from protected conduct), the court's tentative ruling found that the "allegations that defendants advised, counseled, encouraged, and sought to persuade various Bel Air employees to pursue employment-related lawsuits against Bel Air, and that defendants encouraged other Bel Air employees to quit and sue fall under . . . section 425.16(e)(2)."

7

The court concluded that these allegations "make up the bases for the claims" in Bel Air's first three causes of action.

With respect to the second step of the anti-SLAPP procedure (concerning whether the alleged claims have merit), the court's tentative ruling concluded that Bel Air failed to meet its burden to show a probability that it would prevail on its claims. The court's conclusion was supported in part by its finding that the "litigation privilege applies to the litigation-related activity."

After the hearing on the motion, the court "noted that it did not address the issue of whether during their pre-litigation activities, defendants were in good faith seriously considering suing the plaintiff."[3] The court therefore ordered supplemental briefing on the issue. Following receipt of the parties' supplemental briefs and additional declarations, the court reversed its tentative ruling with respect to prong one of Appellants' motion. The court found that "the defendants were NOT in good faith seriously considering suing the plaintiff in their prelitigation activities." The court quoted Appellants' statements in their declarations that they "did not 'seek to encourage other BEL AIR employees to quit and sue BEL AIR.' " However, the court affirmed its tentative ruling with respect to the second prong of Appellants' motion.

---

[3] As discussed further below, the record on appeal does not include a reporter's transcript, and therefore does not show the trial court's reasoning at the hearing.

8

## DISCUSSION

### 1. *Appellants Did Not Forfeit Their Appeal by Failing to Provide a Reporter's Transcript*

Bel Air argues that Appellants' appeal should be dismissed because Appellants did not include a transcript of the November 23, 2015 hearing as part of the appellate record. We reject the argument.

As reflected in the cases that Bel Air cites, dismissal of an appeal may be warranted in the absence of a reporter's transcript when such a transcript is necessary for meaningful review. (See, e.g., *Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 186 [appeal requiring consideration of testimony could not proceed in the absence of a reporter's transcript or a settled statement].) That is not the case here.

Bel Air argues that the November 23, 2015 hearing involved the parties' "oral arguments on whether the allegations at issue were incidental to [Bel Air's] causes of action, and prong two in its entirety." Bel Air does not claim that the hearing included any live testimony or the introduction of any other evidence. Nor does it identify any particular matter addressed at the hearing that this court must consider to decide the appeal. (See Cal. Rules of Court, rule 8.120(b) ["If an appellant intends to raise any issue *that requires consideration of the oral proceedings in the superior court,* the record on appeal must include a record of these oral proceedings," italics added].) While a record of the hearing would have been helpful to understand the trial court's reasoning, it is not necessary here where our review is de novo and the appellate record includes the trial court's written orders and all the evidentiary materials germane to Appellants' motion. (See *People ex rel. Harris v. Shine* (2017) 16 Cal.App.5th 524, 533

9

[no reporter's transcript of motion hearing was necessary on appeal where the "arguments on appeal do not require consideration of colloquy during hearing on the motion"].)

## 2.    *Procedure for Deciding Anti-SLAPP Motions*

Section 425.16 provides for a "special motion to strike" when a plaintiff's claims arise from certain acts constituting the exercise of the constitutional rights of freedom of speech and petition for the redress of grievances, "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subds. (a) & (b)(1).) Consistent with the statutory scheme, ruling on an anti-SLAPP motion involves a two-step procedure. First, the moving defendant must identify "all allegations of protected activity" and show that the challenged claim arises from that activity. (*Baral, supra,* 1 Cal.5th at p. 396; *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.) Second, if the defendant makes such a showing, the "burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral, supra,* 1 Cal.5th at p. 396.) Without resolving evidentiary conflicts, the court determines "whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment." (*Ibid.*)

Section 425.16, subdivision (e) identifies the categories of conduct that are protected under the anti-SLAPP statute and that may support a motion to strike if a plaintiff's claim arises from such conduct. One category of such protected conduct is "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding

10

authorized by law." (§ 425.16, subd. (e)(2).) A claim arises from protected activity when it is "based on" such activity. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*Cotati*); *Mission Beverage Co. v. Pabst Brewing Co., LLC* (2017) 15 Cal.App.5th 686, 698 (*Mission Beverage*).)

We apply a de novo standard of review to the trial court's order denying Appellants' motion to strike. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

3.    ***Bel Air's Contract Claims Arise From Allegations That Appellants Engaged in Protected Conduct***

    **a.    *Appellants could rely on the allegations in Bel Air's complaint in showing that their alleged prelitigation communications were protected.***

The key substantive issue determining whether Appellants' motion to strike satisfied the first prong of the anti-SLAPP analysis is whether Appellants' alleged statements encouraging other Bel Air employees to quit and "pursue employment-related lawsuits against Bel Air" amount to communications made in connection with protected petitioning activity. The parties agree that statements made in anticipation of litigation may fall into this category. However, they disagree on whether Appellants made a sufficient showing that Appellants were anticipating litigation when they allegedly made these statements to other Bel Air employees.

The parties also disagree sharply about the role of the pleadings and the supporting declarations in deciding this substantive issue. Appellants argue that, under the governing California Supreme Court cases, "it is the *allegations* on the face of the Complaint that determine whether the first prong of the Anti-SLAPP statute is met," and courts may not look "beyond the

11

allegations of the complaint being challenged to discern intent or other motivation." On the other hand, Bel Air argues that Appellants were required to support their motion to strike with evidence showing that Bel Air employees were actually considering litigation seriously and in good faith at the time Appellants made the statements at issue. Bel Air claims that there is no authority "that somehow the language of the operative pleading can obviate the need to make an evidentiary showing of good faith and serious consideration of litigation." Before analyzing the substantive issue, we consider the parties' dispute over the proper procedure to decide it.

Neither party correctly articulates the governing standard. Appellants are incorrect in suggesting that the trial court was limited to considering Bel Air's complaint. Our Supreme Court has explained that, "[i]n deciding whether the initial 'arising from' requirement is met, a court considers 'the pleadings, *and* supporting and opposing affidavits stating the facts upon which the liability or defense is based.' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*), quoting § 425.16, subd. (b)(2), italics added.)

However, Bel Air is also incorrect in claiming that a defendant who asserts protected prelitigation conduct *must* support a motion to strike with evidence regardless of the content of the plaintiff's complaint. Bel Air does not cite any case holding that a defendant moving to strike under section 425.16 must submit evidence to meet its burden of showing that a plaintiff's claim arises from protected activity under prong one. Bel Air cites cases that consider the evidentiary materials submitted in connection with a motion to strike to determine whether particular prelitigation activity occurred in anticipation of

12

litigation.  But none of those cases holds that evidence rather than allegations must determine the outcome of this issue even if the complaint itself alleges protected conduct.

We conclude that, if the complaint itself shows that a claim arises from protected conduct (supplemented, if appropriate, with the plaintiff's description of the factual basis for its claim in its declarations), a moving party may rely on the plaintiff's allegations alone in making the showing necessary under prong one without submitting supporting evidence.  This conclusion is based on the language and purpose of the governing statute and on compelling practical considerations.

As mentioned, section 425.16, subdivision (b)(2) states that the court "shall consider" both the pleadings and the "supporting and opposing affidavits." (*Ibid.*)  But that subdivision does not state that a moving party must *submit* affidavits or other evidentiary support.  Such a requirement would be inconsistent with the statutory purpose for the prong one showing.

The prong one inquiry concerns the decision "whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." (*Navellier, supra,* 29 Cal.4th at p. 88.)  A claim arises from protected activity when that activity underlies or forms the basis for the claim. (*Cotati, supra,* 29 Cal.4th at p. 78.)  A plaintiff's complaint ultimately defines the contours of the claims.  Thus, our Supreme Court has explained that, in the first step of the anti-SLAPP analysis, "the moving defendant bears the burden of identifying all *allegations* of protected activity, and the claims for relief supported by them." (*Baral, supra,* 1 Cal.5th at p. 396, italics added; see *Briggs, supra,* 19 Cal.4th at pp. 1114–1115 [analyzing

13

the allegations in the plaintiffs' complaint to determine whether their claims arose from protected petitioning conduct].)

Consistent with the primary role of the complaint in identifying the claims at issue, courts have rejected efforts by moving parties to redefine the factual basis for a plaintiff's claims as described in the complaint to manufacture a ground to argue that the plaintiff's claims arise from protected conduct. For example, in *Central Valley Hospitalists v. Dignity Health* (2018) 19 Cal.App.5th 203, the First Appellate District recently affirmed the denial of an anti-SLAPP motion by the operator of a hospital that claimed the plaintiff's claims were based on protected medical peer review activities. The complaint did not allege facts concerning peer review, and expressly disavowed basing any claims on peer review conduct. The court rejected the defendant's attempt to construct a peer review claim through facts included in its own declarations. Citing a number of cases that reached similar conclusions, the court explained that " '[t]he question is what is pled—not what is proven.' " (*Id.* at p. 217, quoting *Comstock v. Aber* (2012) 212 Cal.App.4th 931, 942 (*Comstock*).)

Similarly, courts have rejected attempts by plaintiffs opposing anti-SLAPP motions to disavow their own allegations in favor of evidence that is inconsistent with their complaints. For example, in *Comstock* the court held that the cross-complainant's claim that the cross-defendant, Aber, had made a complaint to the police brought the claim within the scope of the anti-SLAPP statute, despite the cross-complainant's argument in opposing the anti-SLAPP motion that Aber did not actually complain to the police. (*Comstock, supra,* 212 Cal.App.4th at p. 942; see *Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 412 [plaintiff's allegations in a prior complaint and her own contentions in her

14

submissions in connection with the defendant's anti-SLAPP motion showed that her claim was based on protected attorney conduct even though the allegations were not supported by evidence in the record].)

Thus, the rule in section 425.16, subdivision (b)(2) that a court must consider affidavits as well as pleadings in the first step of the anti-SLAPP procedure does not provide license to ignore the allegations of a plaintiff's complaint. Rather, it provides a defense against artful pleading in which "the defendant's act of petitioning the government is made to appear as defamation, interference with business relations, restraint of trade and the like." (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 821.) Obviously this purpose is not fulfilled by requiring evidentiary support for a motion when the pleadings themselves show that a plaintiff's claims arise from protected conduct. We therefore conclude that, if the complaint itself alleges acts included within section 425.16, subdivision (e), there is no reason to go beyond the scope of those allegations to determine whether a plaintiff's claims arise from protected conduct.

This conclusion is also supported by a compelling practical concern. As in this case, a defendant may deny acts alleged in the plaintiff's complaint yet also recognize that those allegations describe protected conduct. If the defendant is required to support an anti-SLAPP motion with evidence about the nature of his or her conduct rather than relying on the complaint itself, the defendant might not be able to do so without contradicting his or her own understanding of the relevant events. As mentioned above, this would create an irrational procedure in which a

15

defendant is precluded from mounting an anti-SLAPP challenge to factually baseless claims.[4]

We see no reason to follow a different procedure where a complaint alleges conduct in anticipation of litigation. If the complaint itself alleges protected prelitigation communications, a defendant has no obligation to provide evidence of his or her

---

[4] Where a defendant *denies* engaging in protected conduct, one might argue that a motion to strike a plaintiff's claim that alleges such conduct does not meet the purpose of an anti-SLAPP motion. Section 425.16 explains that the Legislature intended the anti-SLAPP procedure to protect against "lawsuits brought primarily to chill the valid exercise of the constitutional right of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) If a defendant has not actually exercised such a right, how can a lawsuit chill it? However, the argument is ultimately both irrelevant and wrong. It is irrelevant because our Supreme Court has explained that a party bringing an anti-SLAPP motion need not prove that a plaintiff's claim was intended to, or actually did, chill any protected activity. (See *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 66–67; *Cotati, supra,* 29 Cal.4th at pp. 75–76.) And it is wrong because a meritless lawsuit asserting a claim based on alleged protected activity can chill such activity even if it did not occur in a particular case. For example, a plaintiff might file a series of meritless claims against a public interest organization based upon the organization's free speech or petitioning activity with the goal of imposing burdensome litigation costs. The fact that the organization did not actually engage in the protected conduct alleged in a particular case would not diminish the cost of defending the lawsuit. Permitting a plaintiff to proceed with a lawsuit intended to burden protected activity on the ground that the lawsuit has no basis in fact would be a perverse outcome indeed.

actual subjective intent at the time the communications occurred to show that the plaintiff's claims arise from protected conduct.[5]

Our conclusion that Appellants could rely upon the allegations of the complaint in bringing their motion to strike is not affected by Appellants' decision to submit declarations in support of their motion that disputed Bel Air's allegations in some respects. As mentioned above, Appellants denied that they

---

[5] On the other hand, we do not agree with Appellants' suggestion that a court is *precluded* from considering evidence of the defendant's subjective intent if the complaint itself is not sufficient to show that alleged communications were in anticipation of litigation. The suggestion is inconsistent with the language of section 425.16, subdivision (b)(2), and would unreasonably limit a court's analysis of the plaintiff's claims when a complaint is artfully drafted or simply unclear. For example, in *Salma v. Capon* (2008) 161 Cal.App.4th 1275, the cross-defendant (Capon) brought an anti-SLAPP motion directed in part to allegations that he had made inquiries with city officials that cast doubt on the cross-complainant's ownership of certain real property. The court noted that "Capon's contacts with municipal departments were only vaguely described in the cross-complaint," and, citing section 425.16, therefore referred to "Capon's description of such conduct in his declaration to determine if it was protected or unprotected activity." (*Id.* at p. 1286.) Based in part on Capon's testimony that he was "seriously considering litigation," the court concluded that Capon's communications with municipal departments were protected either as requests for the initiation of official proceedings or as part of an investigation in anticipation of litigation. (*Id.* at pp. 1286–1287.) If it had been limited to considering the cross-complainant's allegations alone, the court might not have had sufficient basis to grant the anti-SLAPP motion.

17

encouraged other employees to quit and to sue. Appellants also submitted a declaration from another Bel Air employee testifying that Appellants never "advised, counseled, or persuaded me to attempt to quit my job, to create the false appearance of being terminated by Bel Air Internet, or to sue Bel Air Internet."

Having concluded that Appellants could properly argue that the allegations in the complaint are sufficient to show that Bel Air's claims arise from protected activity, we also hold that Appellants did not forfeit that argument by choosing to controvert the factual basis of Bel Air's claims in connection with the second prong of the anti-SLAPP procedure. A contrary rule would place an unfair burden on a defendant filing an anti-SLAPP motion when the complaint alleges protected conduct but the defendant disputes the factual underpinnings of the plaintiff's claims. A defendant in such a case could be forced to limit his or her arguments attacking the merits of the plaintiff's claims (in connection with the second prong of the anti-SLAPP analysis) to preserve his or her right to argue that the claims arise from protected conduct (in connection with prong one). Like a rule requiring a defendant to provide evidence of protected activity rather than relying on the allegations in the complaint, this would be a paradoxical application of the anti-SLAPP procedure that would place an additional burden on moving parties who are faced with factually baseless claims.

Such a rule would be inconsistent with the purpose of the anti-SLAPP procedure in another respect as well. An anti-SLAPP motion is a preliminary procedure designed to weed out meritless claims arising from protected conduct. It is not a device to decide the ultimate merits of a claim by resolving factual disputes. (*Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907–908;

18

*Freeman v. Schack* (2007) 154 Cal.App.4th 719, 733 [court "accept[s] plaintiff's evidence as true" for purposes of analyzing whether the plaintiff's claim arose from protected activity].) A defendant's declaration denying that he or she engaged in the conduct alleged in the complaint does not foreclose the possibility that a fact-finder could later find that he or she did in fact engage in that conduct. Foreclosing an anti-SLAPP motion based upon one version of the facts would irrationally and unfairly disregard this possibility.

Thus, Appellants could permissibly base their anti-SLAPP motion on Bel Air's allegations as set forth in Bel Air's complaint and explained in Bel Air's declarations, so long as the allegations themselves show that Bel Air's claims arise from acts that are protected under section 425.16, subdivision (e). As discussed below, Bel Air's allegations do so.

> **b.** ***Bel Air's complaint and the declarations Bel Air submitted in connection with Appellants' motion to strike show that Appellants engaged in protected prelitigation conduct.***

Section 425.16, subdivision (e) identifies the categories of conduct that are protected under the statue. That conduct includes a "written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (§ 425.16, subd. (e)(2).)

Although this description can be read to refer to pending litigation, our Supreme Court has explained that communications that are " 'preparatory to or in anticipation of the bringing of an action or other official proceeding' " are within the scope of protected conduct under Code of Civil Procedure section 425.16

19

just as they are within the protection of the litigation privilege under Civil Code section 47, subdivision (b).  (*Briggs, supra,* 19 Cal.4th at p. 1115; *Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1268.)

Such conduct "preparatory to" litigation can include communications in connection with counseling or encouraging others to sue.  For example, in *Briggs*, the defendant—a nonprofit corporation that counseled tenants and mediated landlord-tenant disputes—counseled a tenant concerning a malfunctioning refrigerator, leading to a successful small claims action by the tenant against her landlord.  (*Briggs, supra,* 19 Cal.4th at pp. 1109–1110.)  The court held that the defendant's counseling of the tenant was "in anticipation of litigation" and was therefore protected conduct under section 425.16.  (*Id.* at p. 1115.)  The court noted that "the statute does not require that a defendant moving to strike under section 425.16 demonstrate that its protected statements or writings were made *on its own behalf* (rather than, for example, on behalf of its clients or the general public)."  (*Id.* at p. 1116; see *Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 18 (*Ludwig*) [instigating lawsuits by others was protected conduct under section 425.16].)

Bel Air acknowledges that prelitigation conduct may be protected under section 425.16, but argues that "the courts have imposed a 'good faith and serious consideration' requirement unique to pre-litigation activity."  Bel Air cites authority explaining that this requirement is intended to limit protection of prelitigation communications to circumstances in which future litigation is "genuinely contemplated," rather than just a negotiating tactic or a hypothetical possibility.  (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 824

20

(*Anapol*); see *Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251 (*Action Apartment*) [litigation privilege applies to a prelitigation communication only if the communication "relates to litigation that is contemplated in good faith and under serious consideration"].)**6**

The requirement to show that litigation is seriously contemplated ensures that prelitigation communications are actually connected to litigation and that their protection therefore furthers the anti-SLAPP statute's purpose of early dismissal of meritless lawsuits that arise from protected petitioning activity. (§ 425.16, subd. (a); *Anapol, supra*, 211 Cal.App.4th at p. 824 [the good faith and serious consideration requirement "guarantees that hollow threats of litigation are not protected"]; cf. *Action Apartment, supra,* 41 Cal.4th at p. 1251 [the policy underlying the litigation privilege of affording " 'the utmost freedom of access to the courts' " is furthered only if litigation is "seriously considered"].)

Thus, for example, when a cause of action arises from conduct that is a "necessary prerequisite" to litigation, but will lead to litigation only if negotiations fail or contractual commitments are not honored, future litigation is merely

---

**6** The litigation privilege established by Civil Code section 47, subdivision (b) and the anti-SLAPP procedure established by Code of Civil Procedure section 425.16 are substantively different and "serve quite different purposes." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 322 (*Flatley*).) Nevertheless, the two statutes are related, and courts "have looked to the litigation privilege as an aid in construing the scope of section 425.16, subdivision (e)(1) and (2) with respect to the first step of the two-step anti-SLAPP inquiry." (*Flatley,* at pp. 322–323; see *Briggs, supra,* 19 Cal.4th at p. 1115.)

21

theoretical rather than anticipated and the conduct is therefore not protected prelitigation activity. (See, e.g., *Mission Beverage, supra,* 15 Cal.App.5th at pp. 703–704 [letter commencing termination of a distributor agreement was not preparatory to statutorily required arbitration, as the statute permitted resort to arbitration only if good-faith negotiations failed]; *Anapol, supra,* 211 Cal.App.4th at pp. 826–827 [insurance claims are often paid in the ordinary course of business and are therefore not protected prelitigation activity unless the circumstances show that a claim was merely a necessary prerequisite to expected litigation].) Similarly, payment demands with vague references to future " 'legal remedies' " may not demonstrate that litigation was actually under serious consideration. (*A.F. Brown Electrical Contractor, Inc. v. Rhino Electric Supply, Inc.* (2006) 137 Cal.App.4th 1118, 1128.) And even threats of litigation may not be in good faith when the threatened litigation is barred by principles of res judicata. (See *Bailey v. Brewer* (2011) 197 Cal.App.4th 781, 793–795.)

In contrast to the mere hypothetical possibility of litigation in such circumstances, Bel Air's complaint in this case shows that its contract claims arise from Appellants' alleged serious and active *encouragement* of litigation. The theory of the complaint is that Appellants "advised, counseled, encouraged and sought to persuade" other Bel Air employees to refuse Bel Air's request to sign a release of their potential wage and hour claims, and instead to quit and "pursue employment-related lawsuits" against Bel Air. The serious nature of this alleged encouragement is shown by Bel Air's claim that it caused "disruptions of BEL AIR's contractual, employment relationships with its employees" and resulted in damages in excess of the

22

"$25,000 jurisdictional minimum." Bel Air also alleges, on information and belief, that Appellants' encouragement of other employees occurred "possibly at the encouragement or direction of their own lawyers," suggesting a serious litigation strategy.

Bel Air's declarations further explain the factual basis for Bel Air's claim that Appellants attempted to persuade other employees to quit and sue. (See *Dignity Health, supra,* 19 Cal.App.5th at p. 217 [although the complaint was "factually inadequate," "the essence of [plaintiff's] case can be gleaned from it and the declarations filed in opposition to the anti-SLAPP motion"].) In his declaration in support of Bel Air's opposition to Appellants' motion, Koosed testified that he and other employees were forced to spend "dozens of hours in total dealing with the consequences of [Appellants'] vocal dissent and encouragement of other employees to not sign the documents distributed on June 1, 2015, and even leave their jobs at Bel Air."[7] Those documents included the General Release concerning potential employment claims. There is no apparent reason why Bel Air would claim that so much time was necessary to deal with employee concerns about the documents Bel Air asked them to sign other than to address a serious interest in retaining the right to sue.

Bel Air also argued below that Appellants were themselves seriously considering litigation at the time they allegedly urged others to quit and sue. Bel Air submitted the declaration of a Bel Air senior field installer, Kenneth Marquez, who said that he

---

[7] The trial court sustained Appellants' objections to some of Bel Air's declarations, including this testimony by Koosed. We cite the testimony only for its relevance in clarifying the basis for Bel Air's allegations, not as competent evidence to prove particular facts.

attended a meeting of field installers with Morales on June 8, 2015, during which appellant Morales said "that he was leaving Bel Air, and that he would soon be sitting on a beach in the Bahamas." Bel Air argued in the trial court that the statement gave "the impression that [Morales] intended to sue Bel Air." Bel Air's argument that Appellants intended to sue certainly suggests that Appellants anticipated litigation before they left Bel Air, and also suggests that their alleged statements encouraging litigation by others were serious.[8]

Bel Air also argues that, regardless of Appellants' intent, their conduct could be protected under section 425.16 only if Appellants showed that the persons whom they allegedly encouraged to sue *themselves* seriously considered filing a lawsuit. We do not read the "serious consideration" requirement so narrowly.

Under section 425.16, protected conduct includes "any written or oral statement or writing made *in connection with* an issue under consideration or review by a . . . judicial body." (§ 425.16, subd. (e)(2), italics added.) A statement has a sufficient "connection" with anticipated litigation if the person making the statement is engaged in a serious effort to encourage or counsel litigation by another.

---

[8] Bel Air claims that no lawsuit was filed, but the record shows that Appellants have in fact filed a cross-complaint against Bel Air alleging employment claims. At oral argument, Bel Air pointed out that, while Appellants have sued, the employees that they allegedly encouraged to sue have not. However, as discussed below, Appellants' own right to petition is at issue through Bel Air's allegation that they encouraged others to sue. Appellants' decision to file a cross-complaint is relevant to their intention to exercise that right.

24

This conclusion is consistent with our Supreme Court's decisions holding that counseling or encouraging litigation by others is privileged and protected. As discussed above, the court has explained that a person's prelitigation communications may be "in furtherance of the person's right of petition" even if the communications were made on behalf of another. (§ 425.16, subd. (b)(1); *Briggs, supra,* 19 Cal.4th at p. 1116.) In the course of holding in *Briggs* that the defendant's counseling of a tenant to pursue her legal remedies against her landlord was protected conduct, the court also cited other cases with approval in which courts held that the defendants' encouragement of third parties to participate in litigation was protected conduct. (*Ibid.*, citing *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 781, 784 [letter to celebrities soliciting their support for a proposed complaint to the Attorney General was a protected communication], and *Ludwig, supra,* 37 Cal.App.4th at p. 18 [real estate developer's alleged instigation of lawsuits by others challenging a competing discount mall project was protected conduct].)

In *Rubin v. Green* (1993) 4 Cal.4th 1187, the court also held that communications soliciting litigation by others were protected by the litigation privilege. In that case, the complaint alleged that a resident of a mobile home park, Cedar Village, and a law firm solicited the participation of other Cedar Village residents as clients in anticipated litigation against an owner concerning park conditions. (*Id.* at pp. 1191–1192.) The court held that the alleged solicitation was communicative and within the scope of the litigation privilege. (*Id.* at p. 1193.) The court noted that "numerous decisions have applied the privilege to prelitigation

25

communications, leaving no doubt as to its applicability to the facts alleged in the amended complaint." (*Id.* at p. 1194.)

A rule that predicates the protected status of a prelitigation communication on the subjective intent of the *recipient* of the communication would undermine the purpose of the anti-SLAPP statute. A person who counsels litigation by another exercises his or her own constitutional right to petition the government. As the court explained in *Ludwig*: "A person can exercise his own rights by supporting the forceful activities of others; it would be absurd to hold that the confident opponent who takes the public podium is protected, while the shy opponent who prefers to lend moral support by standing silently in the audience is not." (*Ludwig, supra,* 37 Cal.App.4th at p. 18.) Whether or not a person intends to exercise his or her constitutional right to petition the government by persuading another to file a lawsuit depends upon the state of mind of the person offering the persuasion, not the state of mind of the person whom he or she attempts to persuade.

Such a rule would also be arbitrary. By making the protected status of a communication contingent on the intent of the recipient, the rule would mean that the same communication is protected when made to some persons but not others. For example, if the organization in *Briggs* had advised a number of similarly situated tenants to sue their landlord, the same advice would be treated differently depending upon whether or not particular tenants seriously considered following that advice. Such an irrational result is inconsistent with the legislative requirement that section 425.16 be "construed broadly." (§ 425.16, subd. (a).)

We therefore conclude that Appellants' alleged conduct in encouraging other Bel Air employees to sue was protected prelitigation conduct.

### c. *Appellants' alleged prelitigation activity was not incidental to Bel Air's claims.*

Bel Air claims that, even if Appellants' alleged encouragement of other employees to sue was protected prelitigation activity, such acts cannot support an anti-SLAPP motion here because they were merely "incidental or collateral to the causes of action in which they appear." Bel Air argues that the portion of Appellants' alleged communications with other Bel Air employees that actually urged a breach of the employees' contracts was Appellants' alleged encouragement for those employees "to not do their jobs," and that the encouragement to sue was incidental to that interference. This argument amounts to an attempt to re-characterize Bel Air's own allegations to avoid an anti-SLAPP challenge, and we therefore reject it. (See *Comstock, supra,* 212 Cal.App.4th at p. 942.)

Allegations that are merely incidental or collateral to a plaintiffs' claim are not subject to a motion to strike under section 425.16. (*Baral, supra,* 1 Cal.5th at p. 394.) "Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Ibid.*) "Rather, a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1060 (*Park*).) For example, "where a plaintiff's claim attacks only the defendant's decision to undertake a particular act, and if that

27

decision is not itself protected activity, that claim falls outside the ambit of the anti-SLAPP statute." (*Mission Beverage, supra,* 15 Cal.App.5th at p. 701, citing *Park,* at pp. 1068–1069.)

Here, Appellants' alleged prelitigation communications with other employees did not simply provide evidence of liability or occur close in time to some other act that is the basis for Bel Air's claim. Rather, according to Bel Air's allegations, Appellants urged other employees to pursue a particular course of conduct: refuse to sign the General Release that Bel Air presented; quit Bel Air while claiming wrongful termination; and instead "pursue employment-related lawsuits" against Bel Air. Appellants' alleged encouragement to sue was not a separate act that simply evidenced or led to Appellant's alleged inducement of a contract breach; it was an inseparable part of the alleged communication that formed the basis for Bel Air's claims. Contrary to Bel Air's argument, its complaint does not allege that Appellants simply encouraged other employees "to not do their jobs." Rather, it alleges that Appellants encouraged other employees to "quit and sue."

The complaint does not allege any motivation for Appellants' alleged encouragement of other employees to quit other than to pursue litigation. According to Bel Air's declarations, Appellants presented this alternative as a lucrative alternative to continued employment at Bel Air. According to Marquez, Morales said he would "soon be sitting on a beach in the Bahamas." Daniel Hernandez, another Bel Air field installer, said in his declaration that Morales told him he was "leaving Bel Air, and that he would soon be sitting on a beach in the Bahamas," and that in the same conversation Morales "encouraged me to join him and quit my job at Bel Air."

28

Appellants' alleged encouragement to sue is therefore an integral part of the communications on which Bel Air's claims for tortious interference and breach of contract are based, rather than just evidence of some other decision or conduct that forms the basis for Bel Air's claims.  (See *Park, supra,* 2 Cal.5th at pp. 1064–1066.)  We therefore reject Bel Air's argument that Appellants' protected prelitigation conduct was merely incidental to Bel Air's claims.

**4.**      ***Appellants Are Entitled to Attorney Fees***

Section 425.16, subdivision (c)(1) provides that, with exceptions for certain causes of action not relevant here, "a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs."  Bel Air nevertheless argues that Appellants should not be awarded attorney fees, even if they are successful on appeal, because their motion would have no or minimal effect.  Bel Air cites cases holding that a defendant that files an anti-SLAPP motion that is only partially successful and that does not provide any practical benefit is not entitled to attorney fees under section 425.16 as a "prevailing defendant."  (See, e.g., *Moran v. Endres* (2006) 135 Cal.App.4th 952, 954–955.)

As a result of our holding reversing the trial court's order, Appellants have prevailed in full on their motion to strike.  They are therefore a "prevailing defendant" for purposes of section 425.16, subdivision (c)(1).  Moreover, the relief they have obtained is not illusory.  As explained below, their motion results in the dismissal of one of Bel Air's causes of action (intentional interference) and eliminates one of the two theories of contract breach in two other causes of action (i.e., encouragement of other

29

employees to quit and sue). Appellants are therefore entitled to their attorney fees.

**5.** *Conclusion*

Bel Air's first three causes of action arise in whole or in part from protected prelitigation activity. As discussed above, Bel Air's first cause of action for intentional interference is based upon the allegation that Appellants urged other Bel Air employees to quit and sue the company. Bel Air's second and third causes of action are based in part on that theory and in part on the theory that Appellants did no work for a period of time while Bel Air was paying them.

On appeal, Bel Air has not claimed any error in the trial court's ruling that Bel Air failed to show a probability of success under prong two of the anti-SLAPP procedure. Thus, Bel Air's claims that arise from alleged protected activity under section 425.16, subdivision (e) must be dismissed. This means that Bel Air's first cause of action must be dismissed in its entirety and the portions of Bel Air's second and third causes of action that are based on the claim that Appellants encouraged other employees to quit and sue must be stricken. (See *Baral, supra,* 1 Cal.5th at p. 393 ["an anti-SLAPP motion, like a conventional motion to strike, may be used to attack parts of a count as pleaded"].)

**DISPOSITION**

The trial court's order denying Appellants' motion to strike under Code of Civil Procedure section 425.16 is reversed. Bel Air's first cause of action is dismissed. The following language and the claims it supports are stricken from paragraphs 17 and 23 in Bel Air's second and third causes of action: "and acting in contravention of their duties of care and loyalty, seeking to encourage other BEL AIR employees to quit and sue BEL AIR, and thereby disrupt BEL AIR's business operations."

Appellants are entitled to attorney fees on their motion to strike and their attorney fees and costs on this appeal. The case is remanded for the trial court's determination of the amount of attorney fees and for further proceedings on the remaining portions of Bel Air's complaint and on Appellants' cross-complaint.

CERTIFIED FOR PUBLICATION.

LUI, P. J.

We concur:

CHAVEZ, J.

HOFFSTADT, J.

31