Filed 5/10/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JEWEL NIRSCHL, | B313105 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20STCV14914) |
| v. | |
| ZACHARY SCHILLER et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Richard L. Fruin, Judge. Affirmed.

Boies Schiller Flexner, Jonathan Sherman; Freeman Mathis & Gary and John K. Rubiner, for Defendants and Appellants.

Helen Kim Law, Helen U. Kim and Frank H. Kim; Stiller Law Firm and Ari J. Stiller, for Plaintiff and Respondent.

## INTRODUCTION

Statements made when an employer terminates an employee are not protected by California's anti-SLAPP law solely because the employer asks the employee to sign a release of claims.

Appellants Zachary and Jacquelynn Schiller hired respondent Jewel Nirschl as a nanny. The Schillers terminated Nirschl's employment. They hoped Nirschl would release potential claims against them in exchange for a severance payment. The Schillers asked a friend (who ran a nanny placement service and had helped hire Nirschl) to propose this to Nirschl. Nirschl did not sign the proposed severance agreement. Instead, she brought wage-and-hour claims against the Schillers.

Following discovery, Nirschl amended her complaint to add a claim for defamation. She based her defamation claim on statements Zachary Schiller made to the intermediary during the negotiations over severance. The Schillers responded with an anti-SLAPP motion. They argued that the allegedly defamatory statements were made in anticipation of litigation. They moved to strike not only the new defamation allegations, but also the entire complaint, including wage-and-hour claims not based on the allegedly defamatory statements. The trial court denied the anti-SLAPP motion and required the Schillers to pay some of Nirschl's attorney fees.

We affirm. As we discuss below, the Schillers did not show that Nirschl's defamation claim was based on activity protected by the anti-SLAPP law. And the portion of the Schillers' motion seeking to strike Nirschl's non-defamation claims was frivolous. Thus, the Schillers must pay some of Nirschl's attorney fees.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *Nirschl's Pleading*

According to Nirschl's second amended complaint (SAC),[1] Nirschl worked for Zachary and Jacquelynn Schiller between April 2017 and March 2020. She had childcare and household duties.

Nirschl alleged that during her employment, the Schillers failed to provide her with meal and rest breaks, failed to pay her overtime wages, provided her with inaccurate wage statements, and failed to reimburse her work-related expenses. She also alleged that they failed to timely pay her wages owed at the end of her employment. Based on these claimed violations, Nirschl alleged five separate wage-and-hour causes of action. She also alleged a cause of action for violation of Business and Professions Code section 17200 based on these same Labor Code violations, and a cause of action under Labor Code section 2698 *et seq*., the Private Attorneys General Act (PAGA), again based on the same wage-and-hour violations.

In the SAC's sixth cause of action, Nirschl alleged a claim for defamation. The facts alleged in support of that claim were as follows. She alleged that she was terminated by the Schillers on or about March 11, 2020. She alleged that "[i]n a letter dated March 17, 2020," Zachary Schiller "offered to pay [Nirschl's] wages for days worked between March 9 and 11, 2020, two weeks of paid vacation days and four days of severance pay in exchange for a release of Plaintiff's claims, including the claims alleged herein." Nirschl alleged that "[f]ollowing failed efforts to strongarm [Nirschl] directly into signing the release, Defendants next resorted to manipulating

---

[1] Nirschl's original complaint contained only wage-and-hour claims. Her first amended complaint added a claim under the Private Attorneys General Act. The Schillers did not seek to strike either of the earlier complaints.

3

Alice Fox (the owner of the agency that placed [Nirschl] with Defendants) in an effort to intimidate [Nirschl] into signing the release.  Specifically, Defendant Zachary Schiller, with the knowledge and consent of Defendant Jacquelynn Schiller, requested that Fox assist Defendants in resolving the dispute with Plaintiff.  In doing so, Defendants defamed Plaintiff by accusing her of 'repeated misconduct', including: (1) falsifying time and expense records; (2) verbally assaulting the minor child by referring to him as 'you fucking little shit'—a phrase that Defendant claims the minor child continues to repeat; (3) violently shaking the minor child after he had gone to the bathroom in his diaper; and (4) failing to disclose that [Nirschl] was in a car crash with the minor child in the car."

Nirschl alleged that these four statements made by Zachary Schiller to Fox were false and defamatory.  She alleged Schiller made the statements with malicious intent "to intimidate [Nirschl] and avoid paying her significant unpaid overtime" and with "an intent to injure [Nirschl] and destroy her reputation, employment, and career."

### B. *The Special Motion to Strike*

Shortly after Nirschl filed her SAC, the Schillers moved to strike it under Code of Civil Procedure section 425.16 (the "anti-SLAPP" law).[2] According to the notice of motion, the motion sought to strike "all or part" of the SAC.  But the notice did not further identify any particular part of the pleading that the Schillers hoped to strike.

The Schillers argued that the anti-SLAPP law applied because the allegedly defamatory statements "arose in the context of an attempt by Mr.

---

[2]     Undesignated statutory references are to the Code of Civil Procedure.

4

Schiller to settle contemplated litigation." This was the only justification the Schillers offered for the application of the anti-SLAPP law to the entire SAC. The Schillers argued that the anti-SLAPP law could be applied to the non-defamation causes of action simply because the pleading incorporated the facts supporting the defamation claim into its statement of the remaining causes of action, even though the Schillers did not argue that any element of those causes of action was in any way based on the allegedly defamatory statements.

In support of their argument that the defamation allegations involved protected settlement communications, the Schillers introduced declarations from Zachary Schiller and Alice Fox. Zachary Schiller declared that the family had originally hired Nirschl in 2017 at the recommendation of Jacquelynn Schiller's friend Alice Fox, who operated a service that matched families with prospective nannies. In early 2020, Zachary Schiller declared, he learned about the four incidents that formed the basis of the statements Nirschl alleged were defamatory. He stated that after learning that information, the Schillers decided to terminate Nirschl's employment. The family asked Fox to inform Nirschl of the termination.

According to Fox, she met with Nirschl for coffee at a café. Fox told Nirschl that the Schillers were terminating her employment effective immediately. Fox declared that "[a]t the time of the termination, on the Schillers' behalf I offered [Nirschl] a severance in exchange for a release. Later, [Nirschl] rejected that offer and told me that she believed her termination was wrongful. I understood [Nirschl] to mean that she was considering legal action against the Schillers. I reported this information to the Schillers."

Fox averred that Zachary Schiller told her the four allegedly defamatory statements. But, importantly, Fox's declaration is vague about *when* he did so. In his own declaration, Zachary Schiller testified that in "mid-March 2020," the Schillers "communicated all our concerns about [Nirschl's] conduct as a nanny to Ms. Fox," and that "[i]n particular" he sent Fox an email containing the four supposedly defamatory statements. But in argument before the trial court, the Schillers emphasized that Fox was informed of the allegedly defamatory statements *before* her meeting with Nirschl in order to help Fox explain to Nirschl why she had been terminated. The Schillers stated it would have been "impossible for Ms. Fox to have explained to [Nirschl] that she had been fired without the reason for the action." Similarly, in their briefing on appeal, the Schillers admit that Zachary Schiller made all of the "allegedly defamatory statements" to Fox "[o]n the night of Friday, March 6," three days before the Schillers argue that Fox and Nirschl met at the café. In other words, according to the Schillers, they made the allegedly defamatory statements to Fox before she informed Nirschl of her termination, and therefore necessarily before Nirschl's alleged statement that her termination was "wrongful."

For his part, Zachary Schiller, while also remaining vague about the chronology of events, declared that "[a]fter the termination, I learned that [Nirschl] had told Ms. Fox that she felt that her termination was wrongful and that she was considering legal action against my wife and me. I understood this to be a serious threat to bring litigation against my wife and me." He also testified (again, vaguely as to time) that "I informed Ms. Fox of my wife's and my desire to settle any potential litigation with [Nirschl] through a severance agreement and a severance payment." And, as noted above, he stated that "in mid-March 2020" he provided Fox with the allegedly

6

defamatory information. Schiller stated that he "believed" that he conveyed the allegedly defamatory information as part of "settlement discussions" that "would be relayed to [Nirschl]."[3]

As to the merits of the SAC, the Schillers argued that, if the anti-SLAPP law applied, the entire SAC and all its causes of action had to be stricken because the "absolute litigation privilege" prevented the allegedly defamatory statements from serving as a basis for tort liability. The litigation-privilege theory was largely identical to the Schillers' argument for applying the anti-SLAPP law—that the statements were pre-litigation settlement communications. The Schillers in no way addressed the merits of any element of any of the non-defamation causes of action.

C. *Nirschl's Opposition and the Schillers' Reply*

Nirschl opposed the anti-SLAPP motion. She argued that the allegedly defamatory statements were not made as part of protected pre-litigation communications. Instead, she alleged that the statements were made as part of an effort by the Schillers to obtain a severance agreement before actual litigation was "proposed" or "imminent." Thus, according to Nirschl, the statements did not make the action subject to the anti-SLAPP law, and they were not protected on the merits by the litigation privilege.

---

[3]     Fox's declaration characterized the Schillers' communications as "settlement discussions" in conclusory fashion. But the trial court sustained objections to those statements, and the Schillers have not challenged the court's evidentiary ruling on appeal, meaning that the Schillers have forfeited any challenges to those evidentiary rulings. We thus do not consider those statements by Fox in this appeal. (See *Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014–1015 [forfeiture of evidentiary rulings not challenged on appeal]; *Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1074 [same].)

Nirschl also submitted a declaration directly contradicting Fox's statements. She averred that "[a]t no time during my meeting with Ms. Fox or my subsequent conversations with her did I say that my termination was wrongful or otherwise indicate to her that I intended to pursue legal action against [the Schillers]." She declared that during a March 9, 2020 meeting, Ms. Fox informed her of one of the four allegedly defamatory statements, the accusation that she had "verbally abused" the Schillers' child by using profanity towards him.[4] She declared that she did not learn of the other three defamatory statements until "[a]fter I filed my lawsuit." She denied the truth of all four statements.

The Schillers replied. In their reply papers, they submitted declarations with new evidence. Jacquelynn Schiller's declaration attached a "Non-Disclosure, Confidentiality, and Privacy Agreement," signed by Nirschl, and dated December 24, 2019. (Below and on appeal the Schillers argued that the existence of this agreement showed that they had longstanding suspicions regarding Nirschl). Both Schillers stated that—at some time—Fox had told them, following an undated conversation with Nirschl, that Fox believed, and told the Schillers she believed, that Nirschl "was planning legal action."

The Schillers also described a conversation between Nirschl and Fox (apparently as reported to them by Fox) as follows: "When Ms. Fox offered

_____

[4] This suggests a discrepancy between the allegations of the SAC, which pleads that Fox was brought in "following" failed negotiations over a proposed release sent by Schiller on March 17, and Nirschl's own testimony by declaration, which is that Fox met with Nirschl on March 9, before Zachary Schiller sent the proposed release. We do not find this discrepancy material to the disposition of this appeal, but the parties are free to address it below to the extent relevant to the proceedings.

8

Nirschl the settlement we had proposed Nirschl said 'I can sue them for a lot more.' Ms. Fox then replied, 'you can't sue the Schillers,' and reported that Nirschl gave her a cocky smirk which implied 'just watch me.' Nirschl then proceeded to list claims she could make of a personal nature against [Zachary Schiller] that would be embarrassing if they came out. The claims Nirschl proposed she would make against [Zachary Schiller] were unsubstantiated and untrue." Once again, the Schillers' reply declarations did not specify when this conversation or conversations between Fox and Nirschl occurred, or whether they happened before or after Zachary Schiller first made the allegedly defamatory statements to Fox.

Zachary Schiller attached to his declaration a proposed severance agreement, dated March 17, 2020. Schiller declared that he sent the severance agreement directly to Nirschl on that date. The proposed agreement offered four days of severance pay and stated that "[b]y signing this letter and accepting the severance pay you are agreeing to the release of any and all claims against Zachary & Jacquelynn Schiller regarding your employment with them."

Zachary Schiller also attached an email, dated April 8, 2020, from him to Fox. The April 8 email included the four allegedly defamatory statements, set out in detail. Zachary Schiller's reply declaration stated that he sent this email after retaining a law firm to represent the family because he believed that "litigation by Nirschl against my wife and me was imminent." He stated that the email was sent "based on detailed advice I received from the counsel I had retained" as "part of a settlement effort of what I believed to be litigation that Nirschl would bring." However, as noted above, Zachary Schiller had previously testified that he provided the same allegedly defamatory statements to Fox earlier, in "mid-March" of 2020. In argument

9

below, the Schillers admitted that the April 8 email was not the first time the allegedly defamatory statements were conveyed to Fox, but rather was a "record-keeping exercise to make it clear why they terminated" Nirschl.

D. *The Trial Court Denies the Special Motion to Strike*

On May 21, 2021, the trial court heard—and denied—the anti-SLAPP motion. It found that the Schillers had failed to meet their burden at the first anti-SLAPP step (which, as we discuss below, addresses whether the pleading concerns statements protected by the anti-SLAPP law). It found that the Schillers had failed to demonstrate that the four alleged statements had been made in the course of pre-litigation discussions. It found that "no litigation was contemplated when [Zachary Schiller] gave his 3/17/20 letter to Ms. Fox" or when Zachary Schiller had "discussions" with Fox, and noted that Nirschl "hadn't done anything to cause [the Schillers] to believe otherwise." According to the trial court, "the question that must be asked is: When Defendants initially contacted Ms. Fox, told her why they were terminating Plaintiff's employment, and purportedly asked for her assistance in resolving the 'dispute' with Plaintiff, what evidence shows that Defendants had a reasonable belief that Plaintiff was contemplating litigation? The declarations submitted by Defendants (i.e., their own declarations and that of Ms. Fox) don't provide such evidence." Based on its assessment of this "chronology," the trial court found that the Schillers had not met their burden to show that the statements put at issue in Nirschl's complaint were protected by the anti-SLAPP law. Thus, it denied the motion in its entirety.

Although it did not need to do so, the court also found that Nirschl had met her burden of showing that her pleading could survive, assuming arguendo that the anti-SLAPP law did apply. Given Nirschl's express denial

10

that she had ever threatened litigation at any time to Fox, the court found a triable issue on the Schillers' litigation-privilege argument. It also found that Nirschl otherwise had raised triable questions on her defamation claim.

E. *The Trial Court Awards Nirschl Some of Her Attorney Fees*

Nirschl then moved for her attorney fees as a prevailing plaintiff under section 425.16, subdivision (c)(1). Her argument was that she was entitled to fees because the Schillers' motion was substantially frivolous. She argued that no reasonable attorney could have concluded that the wage-and-hour claims arose from protected conduct under the anti-SLAPP law. She also argued that including the wage-and-hour claims in the motion (thus staying discovery and permitting an appeal as to those claims) appeared to be an attempt to stay those claims and avoid an impending trial.

After the Schillers opposed and Nirschl replied, the superior court granted the motion for fees. The court did not find the anti-SLAPP motion frivolous as to the defamation claim. But it found that there was not even an "arguable" basis for moving to strike the wage-and-hour causes of action since "those causes of action do not involve petition conduct." The court substantially reduced Nirschl's fee request, both reducing the hourly rate requested and apportioning the fees awarded for the non-defamation causes of action.[5]

The Schillers timely appealed both the anti-SLAPP order and the fee award, and we consolidated the appeals.

---

[5] Nirschl has not appealed any portion of the trial court's fee award. Although the Schillers have appealed the fee award, neither party contests the trial court's calculation of the amount of fees.

11

## DISCUSSION

A. *General Principles and Standard of Review*

The anti-SLAPP statute helps "combat lawsuits designed to chill the exercise of free speech and petition rights." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1060 (*Park*).) Anti-SLAPP procedure involves two steps. First, the moving defendant has the burden of establishing that the lawsuit's claims are based on activity protected by the statute. (*Briganti v. Chow* (2019) 42 Cal.App.5th 504, 508.) If the defendant satisfies that step, the burden shifts to the plaintiff to demonstrate under a second step that each challenged claim based on protected activity is legally sufficient and factually substantiated. (*Ibid.*) Here, because we resolve the appeal at the first step, we do not discuss the second step.

The first anti-SLAPP step addresses whether a claim "arises from protected activity." (*Park, supra*, 2 Cal.5th at p. 1062.) As we discuss further below, a claim "arises from protected activity" when "protected activity" forms a basis for the defendant's liability. (*Ibid.*) "Protected activity," in turn, is statutorily defined. "The only means specified in section 425.16 by which a moving defendant can satisfy the ['arising from'] requirement is to demonstrate that the defendant's conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e)." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 66.) Section 425.16, subdivisions (e)(1) and (e)(2), make "any written or oral statement or writing made before a . . . judicial proceeding, or any other official proceeding authorized by law" and "any written or oral statement or writing made in connection with an issue under consideration or review by a . . . judicial body" protected activity.

We review the trial court's decision to grant or deny an anti-SLAPP motion de novo. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

B. *The Schillers Did Not Meet Their Burden at the First Anti-SLAPP Step*

The Schillers argue that the four allegedly defamatory statements were automatically protected activity under sections 425.16, subdivisions (e)(1) and (e)(2) because they "arose in the context of an attempt by [Zachary] Schiller to settle contemplated litigation." They say that "it is blackletter law that settlement negotiations before initiation of litigation are protected" by the anti-SLAPP law.

We disagree. Statements made to try to settle potential litigation (i.e., a dispute that has not yet ripened into an actual lawsuit) may, depending on context, be protected by the anti-SLAPP law. However, such statements are not automatically protected just because the context might be called "settlement negotiations."

1. *Legal Principles*

The anti-SLAPP law makes "any written or oral statement or writing made in connection with an issue under consideration or review by a . . . judicial body" protected activity.[6] (§ 425.16, subd. (e)(2).) Courts have long construed this provision to mean that the first step of the anti-SLAPP law protects some pre-litigation communications—just as many pre-litigation communications have long been privileged under the litigation privilege

---

[6] The Schillers' opening brief also mentions section 425.16, subdivision (e)(1). But they make no argument as to why subdivision (e)(1) might apply to this case, nor is it evident why it might do so. We deem the Schillers to have forfeited argument as to subdivision (e)(1).

13

contained in California's Civil Code. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115 [explaining that "'communications preparatory to or in anticipation of the bringing of an action or other official proceeding are within the protection of the litigation privilege of Civil Code section 47, subdivision (b) [citation], [and] such statements are equally entitled to the benefits of section 425.16.' [Citations.]")

But courts have also recognized that expanding anti-SLAPP protection to any statement that involves potential litigation reaches too far. Almost any dispute could potentially lead to—and so could be argued to be in "anticipation" of—litigation. (*People ex rel. Allstate Ins. Co. v. Rubin* (2021) 66 Cal.App.5th 493, 499 (*Rubin*) ["Prelitigation communications may constitute protected activity, but only if those communications are 'relate[d] to litigation that is contemplated in good faith and under serious consideration'"]; see *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 33 (*Edwards*) ["[i]n the present litigious society, there is always at least the *potential* for a lawsuit any time a dispute arises between individuals or entities"].)

*Edwards*, a litigation privilege[7] case, has an oft-cited test. Protection of pre-litigation statements "only arises at the point in time when litigation is no longer a mere possibility, but has instead ripened into a *proposed proceeding* that is actually contemplated in good faith and under serious

_____

[7] As noted, California's litigation privilege, contained in Civil Code section 47, subdivision (b), has a similar (though not identical) purpose to the anti-SLAPP law in protecting petitioning activity. In determining where to draw the line between protected and unprotected pre-litigation communications, this court may look to how this test has been applied in cases involving the litigation privilege of Civil Code section 47. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 322–323.)

consideration as a means of obtaining access to the courts for the purpose of resolving the dispute." (*Edwards, supra*, 53 Cal.App.4th at p. 39.)[8] Our Supreme Court, citing *Edwards*, has explained that "prelitigation communication is privileged only when it relates to litigation that is contemplated in good faith and under serious consideration." (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251.)

While applying these standards to individual cases may sometimes be difficult, common patterns have produced common results. For example, "[o]rdinarily, a demand letter sent in anticipation of litigation is a legitimate speech or petitioning activity that is protected under section 425.16." (*Malin v. Singer* (2013) 217 Cal.App.4th 1283, 1293; but see *Bailey v. Brewer* (2011) 197 Cal.App.4th 781, 793–795 [even express demand letter not protected activity when potential litigation was conclusively barred by doctrine of res judicata].) Similarly, protected activity may include exhorting others to bring a lawsuit, such as by making "communications in connection with counseling or encouraging others to sue." (*Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 940, 942 (*Bel Air Internet*) [anti-SLAPP prong one satisfied where defendants allegedly "'advised, counseled, encouraged and sought to persuade'" employees to refuse to sign a release of potential wage and hour claims, and instead to quit and "'pursue employment-related lawsuits'"].) And when a dispute has moved to the point of clearly-threatened commencement of legal proceedings, accusations between parties may be litigation activity protected by the anti-SLAPP law. (*Rohde v. Wolf, supra*,

---

[8]     *Edwards* has been applied to the question of whether a prelitigation statement is protected conduct under section 425.16, subdivision (e). (*Rohde v. Wolf* (2007) 154 Cal.App.4th 28, 36 [applying *Edwards* to applicability of section 425.16]; *Haneline Pacific Properties, LLC v. May* (2008) 167 Cal.App.4th 311, 319 [same].)

154 Cal.App.4th at p. 36 [statement that party was involved in "conspiracy," made in context of ongoing dispute in which "attorney threatened to file a lawsuit" and "'apprised' . . . what would be contained in that lawsuit when filed" was protected conduct].)

However, in negotiations before litigation has commenced, the mere fact that litigation is possible—or even likely—if negotiations fail is not enough. "When a cause of action arises from conduct that is a 'necessary prerequisite' to litigation, but that will lead to litigation only if negotiations fail, then future litigation is merely theoretical rather than anticipated and the conduct is therefore not protected prelitigation activity." (*Olivares v. Pineda* (2019) 40 Cal.App.5th 343, 358.) "The critical point . . . is that the mere potential or 'bare possibility' that judicial proceedings 'might be instituted' in the future is insufficient." (*Edwards*, *supra*, 53 Cal.App.4th at p. 36.)

This principle has been applied in cases involving both Civil Code section 47, subdivision (b), and section 425.16. For example, in *Mission Beverage Co. v. Pabst Brewing Co., LLC* (2017) 15 Cal.App.5th 686, 704 (*Mission Beverage*), a letter that began the process of terminating an agreement was not protected conduct under the anti-SLAPP law. The letter was just the first step in a series of negotiations. (*Ibid.*) Litigation (in that case, a statutorily-required arbitration) would only occur if those negotiations failed, meaning that the letter was not protected activity as pre-litigation conduct. (*Ibid.*) Likewise, in *People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809 (*Anapol*), pre-litigation demands to settle claims with an insurance carrier were not protected conduct. (*Id.* at p. 828.) The *Anapol* court reasoned that "while litigation for failure to pay the claim is a *possibility*, it is no more of a possibility than in any case where one party to a

16

contract requests the other party to perform its duties under the agreement." (*Ibid*.)  It held that claims that "simply sought settlement" did not, thereby, become anti-SLAPP-protected communications, and that a party's engaging in "'good faith pre-litigation negotiations that could have settled the disputed . . . claims without the need of a lawsuit'" did not make the claims protected communications.  (*Ibid*.)

Indeed, *Edwards* itself involved settling potential litigation.  (*Edwards*, *supra*, 53 Cal.App.4th at p. 24.)  There, the claim was made against an insurance carrier who had offered a payment "[i]n exchange for appellants' execution of general releases."  (*Ibid*.)  The allegation was that the insurance carrier made negligent and reckless misrepresentations in obtaining these releases.  (*Ibid*.)  Based on the reasoning described above, the *Edwards* court found misrepresentations designed to obtain releases to be conduct unprotected by the litigation privilege.  It held that an allegation that "*respondents* intended, by means of fraudulent misrepresentations and omissions, to protect themselves from *potential* liability [by obtaining releases]" did not suffice to make the alleged misrepresentation protected conduct.  (*Id*. at p. 39.)

These cases also hold that one side's subjective belief that negotiations will fail or that litigation will likely occur is insufficient, standing alone, to transform statements made in a pre-litigation negotiation into protected activity.  (See *Anapol*, *supra*, 211 Cal.App.4th at p. 829 [holding attorney's belief that submission of claim was unlikely to settle dispute, but was instead likely to result in litigation, insufficient to make claim automatically protected by anti-SLAPP law, explaining that "an insurance claim cannot be transformed from a simple claim for payment submitted in the usual course of business into protected prelitigation conduct solely on the basis of the

17

subjective intent of the attorney submitting the claim"]; *Rubin*, *supra*, 66 Cal.App.5th at p. 501 [defendant's "'subjective understanding of the purpose'" of pre-litigation communication was not enough to bring that communication within anti-SLAPP law].) *Strawn v. Morris, Polich & Purdy, LLP* (2019) 30 Cal.App.5th 1087, for example, involved an alleged breach of privacy in the context of "an insurance claim being investigated following the dismissal of criminal charges of arson against the insured." (*Id.* at p. 1097.) The court noted that the defendants believed that the claim was likely to be denied and that litigation was "likely" to occur as a result. (*Ibid.*) However, the court held that "'[r]espondents cannot gain the protection of the [litigation] privilege to protect their own communications merely by establishing that they anticipated a potential for litigation,'" as ""the privilege only arises at the point in time when litigation is no longer a mere possibility, but has instead ripened into a proposed proceeding that is actually contemplated in good faith and under serious consideration as a means of obtaining access to the courts for the purpose of resolving the dispute."" (*Ibid.*, quoting *Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1381.)

Thus, when parties negotiate to resolve a dispute that might ultimately result in litigation—but might also be resolved without litigation—statements made in a pre-litigation negotiation are not automatically protected under the anti-SLAPP law just because they relate to "settlement."[9] We now apply the foregoing discussion to Nirschl's pleading.

---

[9] Settlement discussions after a lawsuit has commenced, of course, require a different analysis, since they are recognized as "having been made in connection with the underlying lawsuit for purposes of section 425.16, subdivision (e)(2)." (*Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95, 114; see *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 963 [settlement discussions in an underlying lawsuit

*(Fn. is continued on the next page.)*

## 2. *Nirschl's Defamation Claim Did Not Arise From Protected Activity*

At the first anti-SLAPP step, the question is whether a defendant has met the burden of showing that a plaintiff's "claim arises from protected activity," which happens "when that [protected] activity underlies or forms the basis for the claim." (*Park*, *supra*, 2 Cal.5th at p. 1062.) "A plaintiff's complaint ultimately defines the contours of the claims." (*Bel Air Internet*, *supra*, 20 Cal.App.5th p. 936.) The complaint therefore has the "primary role" in "identifying the claims at issue" in the first anti-SLAPP step. (*Ibid.*) Our first step is to assess Nirschl's defamation claim as pled in her SAC.

The SAC does not allege that the four defamatory statements were made to resolve litigation—either litigation that had actually commenced, or litigation that had "ripened into a *proposed proceeding* that [was] actually contemplated in good faith and under serious consideration as a means of obtaining access to the courts for the purpose of resolving the dispute." (*Edwards*, *supra*, 53 Cal.App.4th at p. 39.) Rather, the SAC alleges that (a) Zachary Schiller offered to pay Nirschl wages, paid vacation days, and a severance payment in exchange for a release of potential claims; (b) Schiller "manipulated" Fox, an intermediary, "in an effort to intimidate [Nirschl] into signing the release"; and (c) as part of enlisting Fox's help in "resolving the dispute," Schiller made the four allegedly defamatory statements to Fox.

Thus, the fundamental allegation is that the statements were made as part of a negotiation—the negotiation over the severance payment and release—that could have been resolved without a lawsuit before litigation

protected by § 425.16, subd. (e)(2)].) The Schillers' briefing relies heavily on cases concerning post-filing settlement discussions. That is not the situation here.

19

was ripe, or even threatened. We conclude that, as pled, Nirschl's allegations fit within the rule of *Mission Beverage*, *Anapol*, and *Edwards*.

The Schillers suggest that an employer's effort to obtain a pre-litigation release in exchange for a severance payment should always be protected activity, since seeking a release from a just-terminated employee implies that the terminated employee might sue. But, for the reasons given above (and explained in *Mission Beverage*, *Anapol*, and *Edwards*), we disagree. The end of many employment relationships involves a negotiation over a release in exchange for a severance payment. And there is often a possibility that a terminated employee might sue. But, without a demand letter or other evidence of potential litigation that has ripened into a proposed proceeding, release negotiations "will lead to litigation only if negotiations fail," and "future litigation is merely theoretical rather than anticipated and the conduct is therefore not protected prelitigation activity." (*Olivares v. Pineda*, *supra*, 40 Cal.App.5th at p. 358.) Accordingly, Nirschl's pleading of defamation in the SAC, on its face, does not allege pre-litigation activity protected under section 425.16.

However, we must also go beyond the pleading and consider the additional evidence proffered by the parties, since, in the first step analysis, we "must consider affidavits as well as pleadings" as "a defense against artful pleading." (*Bel Air Internet*, *supra*, 20 Cal.App.5th at p. 937.) The additional evidence does not change our minds.

The Schillers ask us to credit the declarations they submitted, draw inferences in their favor, and disregard Nirschl's declaration. But, as our Supreme Court has instructed, at the first anti-SLAPP step, when there is a disputed evidentiary question relevant to the analysis, "[w]e do not . . . weigh the evidence, but accept plaintiff's submissions as true and consider only

20

whether any contrary evidence from the defendant establishes its entitlement to prevail as a matter of law." (*Park*, *supra*, 2 Cal.5th at p. 1067 [applying this rule to anti-SLAPP step one].)

Here, Nirschl denied that she ever "indicate[d]" to Fox that she believed her termination was "wrongful" or that she "intended to pursue legal action against [the Schillers]." While Fox submitted a contrary declaration, at this stage, faced with competing submissions, we do not weigh the evidence, and must accept Nirschl's submission as true. Doing so, we cannot conclude that Nirschl threatened litigation to Fox before Zachary Schiller made the allegedly defamatory statements that were (according to the Schillers) supposedly designed to forestall that litigation. Accordingly, the evidentiary submissions do not cause us to alter our view of Nirschl's pleading. (See *Edwards*, *supra*, 53 Cal.App.4th at p. 34 [for pre-litigation negotiation to constitute protected activity, "a lawsuit or some other form of proceeding must actually be suggested or proposed, orally or in writing"].)

Were we to disregard Nirschl's declaration, our conclusion would be no different. The Schillers' evidence does not establish that Zachary Schiller published the allegedly defamatory statements in the context of litigation that had ripened into a proposed proceeding. The Schillers argued both below and on appeal that Zachary Schiller published the allegedly defamatory statements to Fox before Fox met with Nirschl to announce the termination. Thus, by the Schillers' own account, Schiller published the statements before any threat of litigation from Nirschl to Fox. Moreover, the Schillers' declarations do not establish that Nirschl threatened litigation. Fox testified that Nirschl told her that she believed that her termination was "wrongful." But a mere assertion by a former employee that a termination was "wrongful" does not equate to an explicit threat of litigation. Zachary

21

Schiller (in a reply declaration that the trial court was within its discretion to disregard)[10] stated that, at some point, he developed a belief that litigation was "imminent." But, for the reasons we explain above, one party's purely subjective belief that litigation is likely to follow a pre-litigation negotiation is not enough, without more, to make statements connected to that negotiation protected under the anti-SLAPP law.[11] (*Anapol*, *supra*, 211 Cal.App.4th at p. 829.) Thus, the Schillers' evidentiary submissions do not alter our conclusion. Nirschl's defamation claim does not arise from protected activity under section 425.16.

### 3. *Nirschl's Wage-and-Hour Claims Did Not Arise From Protected Activity*

The Schillers' motion also sought to strike all of Nirschl's non-defamation causes of action (i.e., the causes of action for wage-and-hour violations, PAGA violations, and violations of Bus. & Prof. Code, § 17200), and thus to strike the entire SAC. We find this portion of the Schillers' motion frivolous.

---

[10] The trial court was within its discretion to ignore the Schillers' reply declarations in their entirety because they submitted new evidence for the first time on reply. (*Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1537 [applying general rule of motion practice that "new evidence is not permitted with reply papers" to anti-SLAPP motions].)

[11] Zachary Schiller's hearsay reports of statements made by Nirschl in his reply declaration do not establish an express threat of litigation by Nirschl. Schiller's reply declaration, even if credited, states that Nirschl made a "smirk" after Fox stated "you can't sue the Schillers." That is not an express threat of a litigation that had ripened into a proposed proceeding. In any event, as explained in the previous footnote, the trial court had no obligation to consider Schiller's reply declaration at all.

22

The four allegedly defamatory statements were the only allegations in the SAC that the Schillers ever contended were anti-SLAPP-protected activity. The Schillers do not assert that these four statements were elements of—or formed the basis of any potential liability for—the SAC's seven non-defamation causes of action. The Schillers do not assert that any element of these additional causes of action constituted activity protected by the anti-SLAPP law.[12] Nonetheless, argue the Schillers, they were entitled to strike the additional causes of action because Nirschl "incorporated" the four defamatory statements into the entire pleading. Well-established law contradicts this argument.

The anti-SLAPP law allows moving parties to strike a "cause of action." (§ 425.16, subd. (b)(1).) "When the Legislature declared that a 'cause of action' arising from activity furthering the rights of petition or free speech may be stricken unless the plaintiff establishes a probability of prevailing, it had in mind *allegations of protected activity that are asserted as grounds for relief*. The targeted claim must amount to a 'cause of action' in the sense that it is alleged to justify a remedy." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 395 (*Baral*).) Thus, at the first anti-SLAPP step, a defendant seeking to strike a claim must demonstrate that protected activity "supplies one or more elements of a plaintiff's claims." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 887.) "A claim arises from protected activity when that activity underlies or forms the basis for the claim." (*Park, supra,* 2 Cal.5th at p. 1062.) Courts must "respect the distinction between activities that form

---

[12]   The Schillers have never contended that any element of any of the seven wage-and-hour-related causes of action arose from protected activity under the anti-SLAPP law. (See *Callanan v. Grizzly Designs, LLC* (2022) 81 Cal.App.5th 517, 527 ["[f]ailing to pay minimum wage is not an act in furtherance of the right of petition or free speech"].)

23

the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim." (*Id.* at p. 1064.) Put another way, to satisfy the requirements of the first anti-SLAPP step, the defendant must show that protected activity constitutes the "wrongful act forming the basis for . . . liability" on that claim. (*C.W. Howe Partners Inc. v. Mooradian* (2019) 43 Cal.App.5th 688, 701.)

This is not a new or unusual point of law. For approximately 20 years, it has been clear that "the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78; see *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1001 ["[t]he phrase 'arising from' in section 425.16, subdivision (b)(1) has been interpreted to mean that 'the act underlying the plaintiff's cause' or 'the act which forms the basis for the plaintiff's cause of action' must have been an act in furtherance of the right of petition or free speech"].)

Thus, the Schillers had no basis in law for moving to strike the non-defamation causes of action. That the pleading "incorporated" allegations about the allegedly defamatory statements does not matter. No portion of the non-defamation causes of action was based either on those statements or on anything the Schillers even contended was protected activity under the anti-SLAPP law.

*Baral* is the only authority the Schillers cite to justify their motion to strike the non-defamation causes of action. But *Baral* does not support the Schillers. *Baral* concerns so-called "mixed" causes of action, in which a single cause of action in a complaint alleges liability based on some elements that are protected activity under the anti-SLAPP law and some elements that are not protected activity. (*Baral*, *supra*, 1 Cal.5th at p. 382.) *Baral* allows an

24

anti-SLAPP movant to seek to strike protected activity within such a "mixed" cause of action. (*Ibid.*) However, *Baral* repeatedly emphasizes the longstanding rule that for a "claim" to be subject to the anti-SLAPP law, the "claim" must involve "*allegations of protected activity that are asserted as grounds for relief.*" (*Id.* at p. 395 [explaining that allowing movants to target portions of "mixed" claims allows them to target "*particular* alleged acts giving rise to a claim for relief"].)

Even if there were ambiguity in *Baral*—and we do not see any—cases that came after *Baral* but before the Schillers filed their anti-SLAPP motion reaffirmed that anti-SLAPP motions may only target causes of action where protected activity forms an alleged element of liability. (See, e.g., *Park*, *supra*, 2 Cal.5th at p. 1060 [holding that "a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of"].) Accordingly, the Schillers had no reasonable basis for moving to strike Nirschl's non-defamation causes of action.

C. *Nirschl Was Entitled to Attorney Fees*

Under section 425.16, "[i]f the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion." (§ 425.16, subd. (c)(1).)

Here, though we do not reach the conclusion lightly, no reasonable attorney could have believed that it was proper to move to strike Nirschl's non-defamation causes of action under section 425.16, for the reasons we state above. (*L.A. Taxi Cooperative, Inc. v. The Independent Taxi Owners Assn. of Los Angeles* (2015) 239 Cal.App.4th 918, 932 (*L.A. Taxi*) [in context of anti-SLAPP motion, "'[f]rivolous . . . means that any reasonable attorney

25

would agree the motion was totally devoid of merit'"].) The trial court not only had discretion, but was required, to award fees to Nirschl based on this portion of the Schillers' motion. (*Moore v. Shaw* (2004) 116 Cal.App.4th 182, 200 [award of attorney fees to prevailing plaintiff is mandatory when "any reasonable attorney would agree that an anti-SLAPP motion did not lie under these circumstances"]; *L.A. Taxi*, *supra*, at p. 932 [in context of anti-SLAPP fee award to prevailing plaintiff, "we review the trial court's determination [of a fee award] for an abuse of discretion"].) We therefore affirm the trial court's fee award.[13]

For the same reason, we independently find the Schillers' appeal to be frivolous under section 425.16, subdivision (c)(1), insofar as it concerns the non-defamation causes of action. "'Appellate challenges concerning the [special] motion to strike are also subject to an award of fees and costs, which are determined by the trial court after the appeal is resolved." (*L.A. Taxi*, *supra*, 239 Cal.App.4th at p. 933.) Accordingly, on remand, Nirschl may recover her reasonable attorney fees for this appeal.

We note one reason why it is particularly appropriate for Nirschl to obtain appellate fees. The Schillers were able to obtain an unwarranted tactical advantage by pursuing a frivolous appeal on the non-defamation causes of action. "[A]n appeal from the denial of an anti-SLAPP motion automatically stays further trial court proceedings on the merits." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 195 (*Varian*).) But "[s]uch an appeal does not . . . stay proceedings relating to causes of action not affected by the motion." (*Id.* at p. 195, fn. 8; see John B. Eisenberg et al.,

---

[13]    Neither party has challenged on appeal either the amount of the trial court's award or the court's allocation of fees between the defamation and non-defamation claims.

Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2022) at ch. 7A, ¶ 7:37 ["An appeal can be taken from a severable part of a judgment or order. A stay on the partial appeal does not suspend trial court proceedings pertaining to the *unappealed* portion of the judgment or order"].)

Here, the Schillers appealed as to the entire SAC. They did so even after the trial court correctly found the motion frivolous as to most of Nirschl's SAC. The Schillers informed the trial court that "the appeal is going to be of every cause of action." The Schillers were thereby able to obtain a full stay of the action in the trial court, even though the appeal was frivolous as to most of the action. If the Schillers had appealed as to only the defamation cause of action, Nirschl might have had the opportunity to argue for permission to continue discovery. She might have been able to proceed on the remainder of her case. But the Schillers denied Nirschl that opportunity by choosing to pursue an appeal that was substantially frivolous. This is another reason why, as our Supreme Court has emphasized, "trial courts should not hesitate to award attorney's fees and costs to prevailing plaintiffs if the 'special motion to strike is frivolous or is solely intended to cause unnecessary delay.'" (*Varian, supra*, 35 Cal.4th at p. 196.)

## DISPOSITION

The order denying the special motion to strike is affirmed, as is the order granting Nirschl her fees and costs in connection with the special motion to strike. The matter is remanded for further proceedings in light of the views expressed in this opinion. Nirschl is awarded her costs and reasonable attorney fees on appeal.

**CERTIFIED FOR PUBLICATION**


DAUM, J.*

WE CONCUR:


CURREY, Acting P. J.


COLLINS, J.


---

*Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28