Filed 2/18/25  Capozza v. Rubin CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| MICHAEL CAPOZZA, | D083064 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CVPS2102359) |
| JOSEPH RUBIN et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Riverside County, Godofredo Magno, Judge.  Affirmed.

McGarrigle, Kenney & Zampiello and Patrick C. McGarrigle for Defendant and Appellant Joseph Rubin.

Orsus Gate, Denis Shmidt, Nabil Bisharat; Salvato Boufadel, Gregory M. Salvato and Joseph Boufadel for Defendant and Appellant DLJJ, LLC.

Purdy & Bailey and Micah L. Bailey for Plaintiff and Respondent.

Joseph Rubin, individually and as Trustee of the Licht 2018 Irrevocable Trust (Rubin), and DLJJ, LLC (DLJJ) (collectively, defendants) appeal the trial court's order denying Rubin's special motion to strike a complaint filed

by Michael A. Capozza, as Trustee of the Michael A. Capozza Separate Property Trust Dated January 25, 2018, individually and derivatively on behalf of 395 Palm Canyon, LLC (395 PC) (collectively, Capozza), as a strategic lawsuit against public participation (SLAPP). (See Code Civ. Proc.,[1] § 425.16.) DLJJ also seeks to appeal the denial of its joinder in Rubin's anti-SLAPP motion.

Defendants contend the court erred by finding that Capozza's claims do not arise from protected litigation activity. Defendants also assert that while the court correctly found that the operative complaint's fraud allegations related to tax filings arose from protected activity, the court erred in finding that Capozza showed a probability of succeeding as to those allegations. DLJJ separately argues that it has standing to appeal the denial of Rubin's anti-SLAPP motion because it filed a proper motion for joinder.

We conclude that defendants failed to meet their burden of showing that the complaint's allegations about litigation activity are protected under section 425.16, subdivision (e)(1) or (e)(2), because they merely provide context and do not support a claim for recovery. We further conclude that even if the tax-related fraud allegations arise from protected activity, Capozza has met his burden of adducing evidence that, if credited, would sustain a judgment in his favor as to those allegations. Lastly, because we find that DLJJ filed a valid motion to join Rubin's anti-SLAPP motion, we conclude it has standing to appeal the trial court's order denying joinder, which we construe as the functional equivalent of an appealable order

---

[1] All undesignated statutory references are to the Code of Civil Procedure.

2

denying an anti-SLAPP motion.  Accordingly, we affirm the denial of defendants' motion to strike.

FACTUAL AND PROCEDURAL BACKGROUND

*A. Background*

In 2017, Rubin and his family members began raising capital to open cannabis retail businesses in Coachella and Palm Springs, California.  Rubin persuaded Capozza to invest in 395 PC, an entity formed to purchase and hold the property from which one of the cannabis businesses (TLPS) would operate.  Rubin allegedly told Capozza that he and his family would contribute $700,000 in capital to TLPS and $1.466 million to 395 PC.  Impressed by Rubin's representations about TLPS's projected profitability and Rubin's claims about his family's personal wealth and investment power, Capozza invested $500,000 in 395 PC in 2018.

In 2019, Rubin, Capozza, and another investor signed an Operating Agreement to govern 395 PC, appointing Rubin as the company's initial manager.  The Operating Agreement provided that one of the Rubin family's trusts (Children's Trust) would contribute $1.466 million in capital to 395 PC.  Capozza alleges, however, that the Children's Trust never fulfilled its obligation to contribute capital and instead misappropriated funds from TLPS and investors.  Meanwhile, Rubin took out multiple loans on 395 PC's property and signed a lease between 395 PC and TLPS which dramatically increased TLPS's monthly rent.

TLPS underperformed after opening its doors, and 395 PC became delinquent in its mortgage payments.  Capozza alleges he learned near the end of 2020 that Rubin had commingled funds between 395 PC and TLPS, fraudulently transferred funds out of TLPS, and siphoned funds from 395 PC and TLPS to pay for personal expenses.  Capozza also claims that TLPS

3

failed to pay any of the rent it owed to 395 PC, and that Rubin and his family concealed all of these and other violations of the Operating Agreement from investors.

### B. First Amended Complaint

Capozza filed a first amended complaint against defendants and other entities, including some of Rubin's family members,[2] alleging civil conspiracy and numerous causes of action: breach of fiduciary duty, securities fraud, intentional misrepresentation, concealment, expulsion of a limited liability company member, breach of the Operating Agreement, unfair competition, conversion, civil theft, aiding and abetting breach of fiduciary duties, aiding and abetting fraud, intentional interference with existing contractual relations, accounting, and breach of lease.

#### 1. Litigation-Related Allegations

Among the complaint's 264 paragraphs, Capozza includes an allegation that "as a result of [Rubin's] fraud, mismanagement, conversion, misappropriation, and opulent spending habits" in carrying out a hotel and retail development in Coachella (the Glenroy Project), "a multitude of lawsuits have been filed in the last three years, all of which are intertwined with the failed construction project." In five subsequent paragraphs, the complaint describes lawsuits filed in connection with the Glenroy Project, purportedly to highlight the Rubin family's "fraud and complete inability to pay their debts[.]" The complaint also alleges that the Rubin family's fraud in this case was motivated by a desire to shield itself "from the ever-

---

[2] Abraham Stuart Rubin, Annette Rubin, and ASR Development Co., who are Rubin's co-defendants in the underlying litigation, also filed a notice of appeal in this case. Their appeal was dismissed, however, after they failed to file an opening brief after notice given pursuant to California Rules of Court, rule 8.220(a).

4

increasing number of third-party creditors related to the Glenroy Project and their other failed real estate ventures on top of the fact that at the time, 395 PC was grossly behind on its mortgage payments[.]"

Later in the complaint, Capozza alleges that Rubin refused to produce 395 PC's books and records for inspection, which is the subject of a separate petition for writ of mandate. Capozza claims the Rubin family conspired with each other to conceal their fraud in connection with 395 PC, which "included colluding with the multiple attorneys that the Rubin Family hired to represent 395 PC and TLPS, supposedly as nominal defendants, in connection with the instant lawsuit and the other lawsuit filed against TLPS, which served to drain 395 PC and TLPS of all resources." Capozza also claims that Rubin used 395 PC and TLPS resources to pay for individual representation by certain named law firms, "which has caused significant damage to 395 PC and which violated the 395 PC Operating Agreement."

2. Tax-Related Allegations

The complaint alleges that Rubin misled 395 PC's tax advisors, Squar Milner LLP (Squar Milner) and Baker Tilly, LLP (Baker Tilly), into believing that another entity, Rubin Capital Group LLC (RCG), had acquired the Children's Trust's entire interest in 395 PC. As a result, Baker Tilly included RCG as a partner in 395 PC's 2019 tax returns. Rubin then allegedly executed fraudulent state and federal tax returns in 2020 falsely indicating that RCG contributed about $1.37 million in cash to 395 PC. The 2020 tax returns are the subject of a separate suit Capozza filed against Baker Tilly.

The complaint further alleges that defendants intentionally misrepresented that the tax returns were accurate, concealed that the tax

5

returns were not prepared properly, and refused to correct the tax returns. Capozza claims these acts caused significant damage to himself and 395 PC.

### C. Rubin's Special Motion to Strike

Rubin filed an anti-SLAPP motion to strike the entire first amended complaint, or alternatively, the allegations about litigation and tax filings. He argued that because the complaint alleges civil conspiracy and incorporates every paragraph—including the litigation activity allegations—into each of the counts, the entire complaint is subject to being stricken because litigation is protected activity under section 425.16, subdivision (e)(1) and (e)(2). Rubin also contended, citing *Li v. Jin* (2022) 83 Cal.App.5th 481 (*Li*), that the tax filing allegations arise from protected activity because the filings constitute writings made in an official proceeding, or in connection with an issue under consideration or review by the Internal Revenue Service (IRS).

In opposition to the anti-SLAPP motion, Capozza argued that the paragraphs in the complaint describing litigation activity only provide background information and are incidental to allegations that defendants committed fraud and wrongfully depleted funds belonging to 395 PC. Capozza also distinguished *Li*, arguing that unlike the IRS's review of an application for tax-exempt status at issue there, the IRS's mere receipt of tax returns is ministerial and involves no deliberation or discretionary decision-making.

In support of his opposition, Capozza submitted his own declaration and a declaration from John H. Yaeger, a certified public accountant with experience in the cannabis industry. Capozza's declaration said, among other things, that he had subpoenaed business records from Squar Milner including e-mails showing that the accountants preparing 395 PC's 2019 tax returns

6

doubted the information Rubin gave them about contributions from Rubin family entities. His declaration attached copies of those e-mails along with copies of 395 PC's 2019 tax returns, which indicated that RCG contributed about $1.37 million to 395 PC and claimed a proportionate loss of $767,537. Capozza also attached a copy of the trial court's receivership order, in which the court found by a preponderance of the evidence that defendants "never actually purchased an interest" in 395 PC, "have no right to manage it, have failed to keep other investors informed regarding the economic condition of the company, and have used company funds for their own benefit." Capozza further stated in his declaration that he subpoenaed bank statements showing that Rubin and his family members transferred over $1.5 million out of 395 PC and TLPS accounts in late 2018 and early 2019.

Yaeger stated in his declaration that he had been retained by Capozza to review 395 PC's accounting records, and after reviewing those records, he previously provided an opinion for Capozza in connection with Capozza's motion to appoint a receiver for 395 PC and TLPS. In that prior declaration filed with the court, Yaeger stated that his review of documents and records led him to conclude that Rubin and other defendants misappropriated over $2 million from 395 PC and TLPS, and that 395 PC's 2019 and 2020 tax returns were "grossly inaccurate."

In addition to reaffirming the conclusions in his first declaration, Yaeger opined in his second declaration that RCG and another Rubin family entity "derived a significant and unwarranted tax loss from both TLPS and 395 PC, which ultimately flows down to" the Rubin family. Citing schedule K-1 forms attached as exhibits to his declaration, Yaeger stated that "RCG claimed a tax loss of $767,537 in 2019 and $65,239 in 2020 in connection with 395 PC, despite failing to contribute the requisite $1,466,000 in cash to 395

7

PC." He further opined that "[t]hese losses should have been allocated to the innocent investors in 395 PC, who actually contributed cash to 395 PC, which has harmed them significantly on an individual basis."

Rubin filed objections to the declarations on various grounds, primarily arguing that Yaeger's reference to his prior opinion constitutes hearsay, lacks foundation, and calls for speculation, because the prior opinion was not attached to his declaration. Rubin also submitted his own declaration and his attorney's declaration in support of his anti-SLAPP motion.[3] In his declaration, Rubin stated that he is not an accounting expert and "reasonably relied on the tax and bookkeeping professionals" to accurately prepare 395 PC's tax returns. He stated that he did not execute 395 PC's 2020 tax returns or make any statements regarding the information in those returns. Rubin also denied that he intended or authorized "the submission of any 'fraudulent' tax returns for 395 PC, either while as a manager (in connection with the 2019 tax year tax returns) or thereafter (in connection with the 2020 tax year tax returns)."

*D. DLJJ's Notice of Joinder*

DLJJ and other named defendants filed notices of joinder to Rubin's anti-SLAPP motion. In its notice, DLJJ stated that it was joining Rubin's anti-SLAPP motion and adopting "all of the arguments and evidence submitted by Mr. Rubin in support of same." DLJJ asserted that the reasoning in Rubin's anti-SLAPP motion "applie[d] equally to DLJJ as the allegations against DLJJ are duplicative of the allegations made against Mr. Rubin and are largely based on a claim that DLJJ is Mr. Rubin's alter-

---

[3] In his declaration, Rubin's attorney, Patrick C. McGarrigle, merely stated the date on which he received a true and correct copy of the first amended complaint, which was attached to the declaration.

ego." DLJJ also requested "an order striking the First Amended Complaint as to DLJJ" and asked for "its costs and attorneys' fees in bringing a special motion to strike."

Capozza opposed DLJJ's joinder, arguing that "DLJJ did not provide any substantive fact or law to distinguish the frivolous Motion filed by [Rubin]" and "[a]s such, CAPOZZA expressly incorporates all facts, arguments and request for attorney's fees that he detailed in his Opposition and supporting evidence as to DLJJ."

*E. Trial Court's Ruling*

The trial court denied Rubin's anti-SLAPP motion, finding that Rubin failed to meet his burden of showing that the complaint arose from litigation activity because "the crux" of the complaint had to do with Rubin's alleged fraud in obtaining capital contributions, his mismanagement of 395 PC, and his misappropriation of funds. The court concluded that the litigation activity allegations "merely provide[] background and context" for Rubin's wrongful conduct, are "incidental to this lawsuit," and "are superfluous to the core injury-producing conduct." Allegations about using misappropriated money to fund Rubin's litigation defense, the court held, "are merely examples of [Rubin's] breach of fiduciary duties and do not form the basis" of Capozza's claims.

As for the tax filing allegations, the court found Rubin's reliance on *Li* persuasive and concluded that the filings constitute writings made in connection with an official proceeding under the anti-SLAPP statute. The court also found that unlike the litigation allegations, the tax-related allegations appear to support at least Capozza's claims for breach of fiduciary duty, fraudulent concealment, and expulsion of a limited liability company member. The court nonetheless denied Rubin's anti-SLAPP motion because

9

it found that Capozza met his burden of making a prima facie showing of facts that would support a judgment as to the tax filing allegations. After overruling Rubin's objections to Capozza's and Yaeger's declarations, the court relied on the fact that Yaeger had reviewed 395 PC's accounting records and tax returns and opined that Rubin derived an unwarranted tax loss which should have been allocated to investors like Capozza.

DISCUSSION

I

On appeal, defendants contend the trial court erred by finding that the allegations about litigation merely provide context and do not support a claim for recovery. Defendants also argue that while the court correctly found the tax filing allegations arise from protected activity, the court erred in overruling objections to Capozza's and Yaeger's declarations and finding that Capozza showed a probability of succeeding as to those allegations. We disagree with both these points, and therefore need not address defendants' other arguments about the merits of Rubin's anti-SLAPP motion.

*A. Governing Law*

The anti-SLAPP statute provides, in relevant part, that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . in connection with a public issue shall be subject to a special motion to strike [anti-SLAPP motion], unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Ruling on an anti-SLAPP motion typically involves two steps. First, the defendant moving to strike a cause of action must show the act underlying the claim falls within one of the four categories of protected activity listed in section 425.16, subdivision (e). (*Baral v. Schnitt* (2016)

10

1 Cal.5th 376, 396 (*Baral*); *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 66 ["only means" by which a moving defendant can satisfy section 425.16 requirements is "to demonstrate that the defendant's conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) . . . ."]; *Bowen v. Lin* (2022) 80 Cal.App.5th 155, 160 (*Bowen*).)

The first two categories of protected activity in subdivision (e) pertain to statements or writings made before, or in connection with, a "legislative, executive or judicial body, or any other official proceeding . . . ." (§ 425.16, subd. (e)(1), (2).) The third category involves statements or writings made in a public place or forum, and the fourth category includes other conduct in furtherance of free speech or the right to petition. (*Id.*, subds. (e)(3), (4).) The first two categories, which are at issue in this case, require that the alleged action involve an official proceeding. (*See Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117–1118.)

If the defendant makes a sufficient showing under the first prong of the anti-SLAPP analysis, the burden shifts to plaintiffs to show that their causes of action are legally sufficient and supported by evidence that, if credited, would sustain a judgment in their favor. (*Baral, supra*, 1 Cal.5th at pp. 384, 396; *Bowen, supra*, 80 Cal.App.5th at p. 160.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*); *accord, Bowen*, at p. 160.) The trial court's decision on both prongs is subject to de novo review on appeal. (*Geiser v.*

11

*Kuhns* (2022) 13 Cal.5th 1238, 1250; *Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 796; *Starr v. Ashbrook* (2023) 87 Cal.App.5th 999, 1018.)

### B. Analysis

#### 1. Litigation Allegations

"The constitutional right of petition encompasses the basic act of filing litigation," and a claim for relief filed in court is indisputably a statement or writing made before a judicial proceeding. (*Navellier, supra*, 29 Cal.4th at p. 90 [cleaned up].) The mere presence of allegations about litigation, however, do not bring claims under the anti-SLAPP statute's purview. (*Paul v. Friedman* (2002) 95 Cal.App.4th 853, 866 ["The statute does not accord anti-SLAPP protection to suits arising from any act having any connection, however remote, with an official proceeding. The statements or writings in question must occur in connection with 'an issue under consideration or review' in the proceeding."].) Rather, we must determine whether protected conduct alleged in the complaint supplies the elements of a claim or instead is merely incidental background. (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1012.) "If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute." (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1272.) In other words, "[a]llegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral, supra*, 1 Cal.5th at p. 394.) A claim may be struck only if the protected activity itself is the wrong complained of, not just evidence of liability or a step leading to a different act for which liability is

12

asserted. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1060 (*Park*).)

We conclude that the litigation-related allegations here only provide context and are incidental to the main thrust of Capozza's complaint. The litigation allegations address the Rubin family's involvement in the Glenroy Project, a separate business endeavor from 395 PC and TLPS. While the complaint asserts that defendants committed fraud against 395 PC and TLPS in part to pay off their debts from the Glenroy Project, those allegations merely provide context for what may have motivated defendants' alleged misconduct. And although the allegations also serve to highlight similarities between third-party disputes and the current litigation, the other suits are not *themselves* the wrong complained of.

The fact that the complaint alleges defendants used misappropriated resources to fund their litigation defense does not alter our conclusion. In *Gaynor v. Bulen* (2018) 19 Cal.App.5th 864 (*Gaynor*), the beneficiaries of a family trust sued a de facto trustee for allegedly breaching his fiduciary duties by unfairly distributing funds. (*Id.* at p. 869.) The complaint included allegations that the defendant misused trust assets to fund his petitions in probate court. (*Id.* at pp. 873–874.) In affirming the denial of defendant's anti-SLAPP motion, our court concluded that the beneficiaries' claims "were predicated on [the defendant] taking actions to favor himself to the detriment of the [trust] beneficiaries[,]" and that allegations about litigation "merely reflected the manner in which the [other trustees and the defendant] implemented their alleged wrongful plan" to further their own interests. (*Id.* at p. 879.) While recognizing that legal filings are protected activities, we explained that "[a]lthough the alleged breach of loyalty may have been carried out by the filing of probate petitions, it was not the petitioning

13

activity itself that is the basis for the breach of fiduciary claim." (*Id.* at p. 880.)

The same reasoning applies here. Capozza's claims are based on allegations that the Rubin family fraudulently convinced him to invest in 395 PC, mismanaged the business, misappropriated funds for personal gain, and concealed their misconduct along the way. Those alleged actions "provide[] the foundation for the claim," not the allegations related to litigation. (*Trilogy at Glen Ivy Maintenance Assn. v. Shea Homes, Inc.* (2015) 235 Cal.App.4th 361, 368.) That some of the money was allegedly used to fund litigation costs after being taken from 395 PC does not change the analysis.

Nor does the boilerplate incorporation language in the complaint lead us to a different conclusion. At multiple points throughout, the complaint states that Capozza "incorporates herein the allegations contained in each and every paragraph above, inclusive, with the same force and effect as though fully set forth herein." Defendants contend that this somehow infuses the entire pleading with the flavor of protected activity because the litigation-related allegations are among those incorporated. But we attach no significance to the prefatory incorporation of those allegations because they still only provide context and are incidental to Capozza's claims. (See *Newport Harbor Offices & Marina, LLC. v. Morris Cerullo World Evangelism* (2018) 23 Cal.App.5th 28, 45; *Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 936 ["courts have rejected efforts by moving parties to redefine the factual basis for a plaintiff's claims as described in the complaint

14

to manufacture a ground to argue that the plaintiff's claims arise from protected conduct"].)

Accordingly, we conclude defendants have failed to meet their burden of showing that the litigation allegations fall within the ambit of section 425.16, subdivision (e)(1) or (e)(2). We thus need not, and do not, consider whether Capozza established a probability of prevailing as to those allegations. (See *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 80–81; *Turner v. Vista Pointe Ridge Homeowners Assn.* (2009) 180 Cal.App.4th 676, 688.)

### 2. Tax Filing Allegations

Defendants rely on *Li* to argue that filing an allegedly fraudulent tax return with the IRS constitutes protected activity. In *Li*, the Court of Appeal concluded that applying to the IRS for tax-exempt status is protected activity under section 425.16, subdivision (e)(1) and (e)(2), because the IRS's review of the application "is not purely ministerial." (*Li, supra*, 83 Cal.App.5th at pp. 487, 491–492.) Capozza argues the facts in this case are more akin to *City of Industry v. City of Fillmore* (2011) 198 Cal.App.4th 191, in which the Court of Appeal held that a state board's distribution of local sales tax revenues did not give rise to anti-SLAPP protection because it was a "nondiscretionary, ministerial act that involves no deliberation or discretionary decisionmaking." (*Id.* at p. 217.)

We question whether the reasoning of *Li* would apply to the mere filing of a tax return, which usually only results in ministerial acts of review by the IRS, rather than an official IRS proceeding such as the determination of tax-exempt status in *Li*. We need not decide this question, however, because even if the tax filing allegations may constitute protected activity under

15

section 425.16, subdivision (e)(1) or (e)(2), we conclude that Capozza has met his burden of showing a probability of prevailing as to those allegations.

As noted, if a defendant makes a sufficient showing under the first prong of the anti-SLAPP analysis, the burden shifts to plaintiffs to show that their claims are legally sufficient and supported by evidence that, if credited, would sustain a judgment in their favor. (*Baral, supra*, 1 Cal.5th at pp. 384, 396; *Bowen, supra*, 80 Cal.App.5th at p. 160.) We do not weigh the credibility or comparative strength of the evidence, but instead accept as true all evidence favorable to the plaintiff. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291; *Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699–700.) Defendant's evidence is considered only to determine whether it defeats plaintiff's claims as a matter of law, e.g., by establishing a defense or the absence of a necessary element. (*Baral, supra*, 1 Cal.5th at pp. 384–385.)

Capozza relies on the tax allegations to support his fraud causes of action for intentional misrepresentation and concealment.[4] The elements of fraud are: (a) misrepresentation (false representation, concealment, or

---

[4] The complaint also alleges that the mishandling of 395 PC's tax returns constituted a breach of the Operating Agreement, and that RCG, Children's Trust, or DLJJ should be expelled as a member of 395 PC. To the extent the complaint alleges claims other than fraud based on the 2019 and 2020 tax filings, we consider any arguments that those claims are also subject to being stricken based on the tax allegations forfeited by defendants for failure to raise them in their opening brief. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 684 [a reviewing court "is not required to develop the parties' arguments or search the record for supporting evidence and may instead treat arguments that are not developed or supported by adequate citations to the record as waived"]; *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 554–555 [even applying de novo standard of review, review is limited to issues which have been adequately raised and supported in the opening brief].)

16

nondisclosure); (b) knowledge of falsity; (c) intent to defraud; (d) justifiable reliance; and (e) resulting damage. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) The complaint alleges that Rubin intentionally misled 395 PC's tax advisors about a transaction between RCG and the Children's Trust, and as a result, 395 PC's 2019 and 2020 tax returns were inaccurate. Capozza also alleges that defendants misrepresented and concealed their actions regarding the tax returns, which caused damage to him and 395 PC. To support those allegations, Capozza submitted his own and Yaeger's declarations.

As an initial matter, we conclude that the trial court did not abuse its discretion in overruling Rubin's objections to Capozza's and Yaeger's declarations. (See *Ralphs Grocery Co. v. Victory Consultants, Inc.* (2017) 17 Cal.App.5th 245, 255 ["We review the superior court's evidentiary rulings for abuse of discretion."].) "The proper view of admissible evidence for purposes of the SLAPP statute is evidence which, by its nature, is capable of being admitted at trial, i.e., evidence which is competent, relevant and not barred by a substantive rule." (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 947 (*Sweetwater*) [cleaned up].) However, "evidence may be considered at the anti-SLAPP stage if it is reasonably possible the evidence set out in supporting affidavits, declarations, or their equivalent will be admissible at trial." (*Ibid.*) For example, the Supreme Court in *Sweetwater* concluded that statements contained in plea forms and grand jury transcripts were "potentially admissible at trial" because "there is no categorical bar" to their admission, they "appear to be statements against interest" under Evidence Code section 1230, "there are no undisputed factual circumstances suggesting the evidence would be inadmissible at trial," and "it

17

is not unreasonable to expect that those witnesses may be deposed and/or produced for trial." (*Id*. at p. 949.)

The portions of Capozza's declaration that support the tax allegations consist of certified business records and tax return documents. Like the documents in *Sweetwater*, there appear to be no categorical bars to admitting this evidence at trial, and defendants do not dispute their authenticity. (See *People v. Selivanov* (2016) 5 Cal.App.5th 726, 776 [tax documents may be admissible under the authorized statements hearsay exception]; *People v. Zavala* (2013) 216 Cal.App.4th 242, 245 ["A trial judge is vested with wide discretion in determining whether a proper foundation has been laid for admission of business records under the business records exception."].) Similarly, Yaeger's declaration is a sworn statement in which he described the documents he reviewed and attached the relevant portions of 395 PC's tax returns showing RCG's claimed tax loss. We do not consider it a bar to admission that Yaeger referred to a prior opinion without attaching it, because the opinion was also a sworn statement previously filed with the court in connection with receivership, and Capozza attached the prior opinion to his own declaration. For these reasons, we conclude the trial court did not abuse its discretion in overruling defendants' objections to the declarations.

We further conclude that the evidence in those declarations, particularly Yaeger's, is sufficient to prove that Capozza's fraud claims based on the tax allegations have "minimal merit." (*Park, supra*, 2 Cal.5th at p. 1061.) In his prior opinion, Yaeger concluded after reviewing 395 PC's accounting records that the company's 2019 and 2020 tax returns were "grossly inaccurate." He reaffirmed that conclusion in his updated declaration and further opined that RCG and another defendant entity "derived a significant and unwarranted tax loss from both TLPS and 395

18

PC[.]" Citing schedule K-1 forms attached as exhibits to his declaration, Yaeger specifically opined that "RCG claimed a tax loss of $767,537 in 2019 and $65,239 in 2020 in connection with 395 PC, despite failing to contribute the requisite $1,466,000 in cash to 395 PC." According to Yaeger, the losses RCG claimed "should have been allocated to the innocent investors in 395 PC, who actually contributed cash to 395 PC, which has harmed them significantly on an individual basis."

Capozza's declaration also provides support for his fraud claim as to the tax allegations. His declaration attached subpoenaed business records including e-mails showing that the accountants preparing 395 PC's 2019 tax returns doubted the information Rubin gave them about contributions from Rubin family entities. He attached copies of 395 PC's 2019 tax returns, which indicated that RCG contributed about $1.37 million to 395 PC and that RCG was entitled to a proportionate loss of $767,537. Capozza also referenced the trial court's receivership order, in which the court relied on Yaeger's prior opinion to find by a preponderance of the evidence that defendants "never actually purchased an interest" in 395 PC, "have no right to manage it, have failed to keep other investors informed regarding the economic condition of the company, and have used company funds for their own benefit."

At this stage, it is not our function to resolve the merits of this dispute. But it would be reasonable for a factfinder to conclude from the evidence in Capozza's and Yaeger's declarations, if found to be true, that Rubin knowingly gave false information to 395 PC's accountants and knowingly misrepresented the nature or existence of certain capital contributions, intending to reap unwarranted tax benefits. It would also be reasonable to conclude that Rubin misrepresented the accuracy of 395 PC's tax returns and

19

concealed their inaccuracies from investors, and that Capozza was justified in relying on Rubin's representations given their business relationship. Although the declarations do not expressly state that the tax returns were "fraudulent," if credited, they at least demonstrate a likelihood that Capozza can prove Rubin knowingly misrepresented or concealed information related to the tax filings with the intent to defraud 395 PC's investors.

Moreover, defendants' evidence does not defeat Capozza's claims as a matter of law. (*Baral, supra*, 1 Cal.5th at pp. 384–385.) Rubin submitted a declaration in which he denied Capozza's fraud allegations and stated that he reasonably relied on his accountants. But while Rubin's declaration disputes the credibility of statements in Capozza's and Yaeger's declarations, Rubin's declaration does not establish a defense or the absence of any fraud element as a matter of law, and our role at this stage is not to weigh evidence or resolve conflicting factual claims. (*Baral*, at pp. 384–385.)

Given the above, we conclude that Capozza has met his burden of making a prima facie showing of facts that would support a judgment as to the tax allegations underlying his fraud claims. We therefore affirm the trial court's denial of Rubin's anti-SLAPP motion.

## II

After defendants filed their notices of appeal, we directed the parties to consider *Decker v. U.D. Registry, Inc.* (2003) 105 Cal.App.4th 1382 (*Decker*) and *Barak v. The Quisenberry Law Firm* (2006) 135 Cal.App.4th 654 (*Barak*), and address in their opening briefs whether DLJJ has standing to appeal the denial of Rubin's anti-SLAPP motion. We conclude that because DLJJ filed a valid motion to join Rubin's anti-SLAPP motion, and because we construe the trial court's order denying DLJJ's joinder as the functional equivalent of

20

denying an anti-SLAPP motion, the order is appealable (§ 904.1, subd. (a)(13)) and DLJJ has standing to appeal.

In *Decker*, the Court of Appeal held that a defendant's joinder in his co-defendant's motion to strike was insufficient to give him standing to appeal because he merely joined in his co-defendant's arguments and "did not file a motion seeking relief on his own behalf." (*Decker, supra*, 105 Cal.App.4th at p. 1391.) The court explained that the would-be appellant's notice to join was deficient because it did not "present any evidence or argument," and there was no indication he requested anti-SLAPP relief for himself. (*Ibid.*)

In *Barak*, the Court of Appeal found that a defendant's request to join in a co-defendant law firm's anti-SLAPP motion was sufficient to give him standing to appeal because unlike in *Decker*, the joinder "not only state[d] that he joins in the motion brought by [the firm], he request[ed] affirmative relief" in that he sought "an order striking Plaintiff's Complaint" as to himself, and an award of costs and attorneys fees in bringing an anti-SLAPP motion. (*Barak, supra*, 135 Cal.App.4th at p. 661.) The defendant's joinder also gave reasons for why a ruling on the firm's anti-SLAPP motion would be applicable to him—specifically, that relief afforded to the firm should also be afforded to him because all the defendants were "in the same relative position with regards to Plaintiff's claims set forth in the Complaint." (*Ibid.*)

We conclude that DLJJ's notice of joinder was not deficient like the filing in *Decker*, and met the criteria laid out in *Barak* for effective joinder. DLJJ stated in its notice that it was joining Rubin's anti-SLAPP motion because its "applies equally to DLJJ as the allegations against DLJJ are duplicative of the allegations made against Mr. Rubin and are largely based on a claim that DLJJ is Mr. Rubin's alter-ego." DLJJ also expressly requested "an order striking the First Amended Complaint *as to DLJJ*" and

21

asked for its own costs and attorneys' fees in bringing a special motion to strike. (Italics added.) These features distinguish DLJJ's joinder from the joinder the court in *Decker* found deficient.

Moreover, Capozza's opposition to DLJJ's joinder did not dispute that Rubin's anti-SLAPP motion should apply equally to DLJJ; rather, Capozza asserted that because "DLJJ did not provide any substantive fact or law to distinguish the frivolous Motion filed by [Rubin,]" all the same "facts, arguments and request for attorney's fees that [Capozza] detailed in his Opposition and supporting evidence" should apply as to DLJJ. Capozza thus seemed to agree that DLJJ should be bound by the ruling on Rubin's anti-SLAPP motion, and given our conclusions on the merits of Rubin's motion, Capozza cannot demonstrate prejudice from allowing DLJJ's joinder. (See *Barak, supra*, 135 Cal.App.4th at p. 661.)

Because we conclude that DLJJ's joinder was valid, we construe the trial court's order denying joinder as an appealable denial of an anti-SLAPP motion and affirm the court's denial for the reasons discussed.

DISPOSITION

The order denying the anti-SLAPP motion is affirmed. Capozza shall recover his costs on appeal.

BUCHANAN, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DATO, J.

22